**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTIN CONROY, GERARD MCCARTHY, and LOUIS VARELA, derivatively on behalf of Aflac, Incorporated,<br><br>               Plaintiffs,<br><br>   v.<br><br>DANIEL P. AMOS, PAUL S. AMOS, II, DOUGLAS W. JOHNSON, CHARLES B. KNAPP, BARBARA K. RIMER, ELIZABETH HUDSON, W. PAUL BOWERS, JOSEPH L. MOSKOWITZ, MELVIN T. STITH,<br><br>               Defendants,<br><br>               -and-<br><br>AFLAC, INCORPORATED,<br><br>            Nominal Defendant. | **C.A. NO. 1:17-CV-09767-DLC**<br><br>**JURY TRIAL DEMANDED** |

## CORRECTED VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Martin Conroy, Gerard McCarthy and Louis Varela, shareholders of the nominal defendant Aflac, Incorporated ("Aflac" or the "Company"), bring this corrected verified amended derivative complaint pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure on Aflac's behalf seeking relief under federal and state law for the misconduct perpetrated against the Company and its shareholders by Defendants, senior executive officers and directors of the Company who had actual knowledge of the grave, credible, well-documented and corroborated allegations of the existential fraud at the Company committed with the direct knowledge and/or participation of the Company's most senior executives, but failed to

investigate those allegations properly, concealed them from the public for over a year, let the fraud continue, and engaged in a concerted effort to cover it up. When Aflac's President Defendant Amos, II, a third-generation Aflac executive, suddenly resigned from all of his positions within the Company, its subsidiaries and affiliates merely one month after being re-elected to its Board of Directors, and sold $17 million worth of Aflac stock while in possession of material non-public Company information -- all in June of 2017 -- the Board stood by silent, and then refused Plaintiffs' demand to take action to remedy Defendant Amos, II's insider trading and other misconduct, leading to the December 14, 2017 filing of the original Complaint in this action and its fallout, summarized below, precipitating the instant amendment.

## SUMMARY OF THE AMENDMENT

1.     On Thursday, January 11, 2018, two minutes after the market closed, an online magazine of investigative "adversarial" journalism called The Intercept published an article titled *Behind The Duck: Former Aflac Employees Allege Fraud and Abuse in Nearly Every Aspect of Company* by David Dayen, based on Plaintiffs' original Complaint in this action; on their 93-page tentative class action complaint which draft Aflac had publicly filed in Georgia and New York courts in an effort to enforce its draconian arbitration agreement; and on Mr. Dayen's interviews with numerous current and former employees of Aflac (**Exhibit 1**). The online article was not picked up by any mainstream media, and was but the first in a series of several to come, revealing only a few of Plaintiffs' numerous allegations; accordingly, the January 11 disclosure was as limited in reach as it was incomplete in scope.

2.     Nonetheless, by 9:39 a.m. on Friday, January 12, 2018, the first trading day after this partial revelation, Aflac's stock price dropped 3.15% on active trading.

3.      At 1:33 p.m. that day, while the stock continued its slide, Defendants caused
Aflac to issue a press release titled *Statement From Aflac Incorporated Regarding Recent False
Allegations* (the "January 12 Press Release"), and stating: "Recent media stories regarding Aflac
contain false allegations made by a very small group of independent contractors. . . . The
unfounded articles allege claims including insider trading, fraudulent sales and financial
manipulation. The Company has investigated these claims and found them to be without merit."

4.      As shown below, the statements in the January 12 Press Release -- that (a)
Plaintiffs allegations were "false" and "without merit," and (b) the Company had investigated
Plaintiffs' claims of "fraudulent sales" and "financial manipulation" -- were knowingly false and
misleading, made with the purpose of falsely comforting the market that there was nothing to
see.

5.      The January 12 Press Release had failed to stop the stock slide, which closed
down 7.5% while the S&P 500 Index rose 0.67%, making Aflac the "Biggest Loser" of the day.
*See* Barron's, *The Biggest Loser: Aflac Sinks 7.4%*, (Jan. 12, 2018) ("Aflac (AFL) fell to the
bottom of the S&P 500 on Friday, hurt by allegations by former employees, which the insurer
denies.")

6.      The January 12, 2018 stock drop of 7.4% constitutes a corrective disclosure
following the partial revelation of the truth on January 11, 2018, and conclusively demonstrates
the materiality of Plaintiffs' allegations.

7.      On January 16, 2018, Defendants caused Aflac to file Form 8-K (the "January 16,
2018 Form 8-K") with the SEC, repeating their contentions that "a small group of independent
sales contractors have made a number of false allegations about Aflac," and stating further: "As
is common in such circumstances, the Company's Board of Directors established a special

litigation committee (SLC) of independent Board members in July 2017 in order to investigate these allegations. The SLC, which was formed pursuant to Georgia statute, is represented by independent counsel. In the spirit of transparency, the Company is making public the first report issued by the SLC. The first report of the SLC can be viewed on investors.aflac.com by clicking under 'Corporate Governance' and 'Special Litigation Committee.' Subsequent to completion of the initial report in September 2017, the derivative plaintiffs raised additional but related claims, and the SLC began to investigate the newly raised claims. The Company expects the SLC's second investigation will be concluded soon and will release the report before the filing of the Annual Report on Form 10-K prior to the end of February 2018."

8.      As shown below, the January 16 Form 8-K is knowingly false and misleading for much the same reasons as is the January 12 Press Release.

9.      As stated in the January 16 Form 8-K, Aflac also made public its SLC Report (**Exhibit 2**), released purportedly "in the spirit of transparency" but only after having been kept under the wraps of privilege for four months since its September 2017 completion date.

10.      As shown below, the SLC Report demonstrates that: (a) the SLC was not composed of the "disinterested" directors as all of its members were Defendant Directors each of whom was substantially likely to face personal liability for his own statements, actions and omissions as alleged herein -- liability that was incurred prior to the formation of the SLC; (b) the SLC investigation to date has been woefully incomplete because the majority of Plaintiffs' allegations, including of the "fraudulent sales" and "financial manipulation," has not been investigated by the SLC or so much as disclosed in its Report.

11.      In fact, the 73-page SLC Report made public by Aflac on January 16, 2018, covers only a carefully selected few of Plaintiffs' many grave allegations contained in their

December 10, 2016 Dispute Notice (the "Dispute Notice") (**Exhibit 3**) and their SEC, IRS and DOL submissions that Plaintiffs shared with the independent Directors in March 2017.

12.     What the SLC Report does ***not*** address -- or so much as even mention -- are many of Plaintiffs' other serious allegations, such as those of the Wells Fargo-style cross-selling (or "overselling" in the insurance industry parlance) of policies without customers' knowledge; financial manipulations such as conversion of existing coverage; misclassification of employees as independent contractors; sexual harassment; whistleblower retaliation; institutionalized theft of commissions through "cheat codes"; and others.

13.     The 16-page Dispute Notice setting out all these allegations in detail is attached hereto as **Exhibit 3**, and its numerous allegations speak for themselves. Comparing the Dispute Notice with the 73-page SLC Report (**Exhibit 2**) reveals the yawning gap between the scope of Plaintiffs' allegations and Defendants' responses to them in the SLC Report, the gap that lays bare the whitewash nature of the Report, otherwise concealed by the smoke and mirrors of the Report's seeming heft and gravitas. In sum, the SLC Report itself is false and misleading, just another element of Defendants' coverup.[1]

14.     Furthermore, the few allegations that the SLC Report responds to it actually admits, explaining them away as immaterial, which explanation crashed along with the stock price on January 12. Stripped of the invalid materiality defense, the SLC Report admits that:

   a.   Defendant Amos II sold $17 million of Aflac stock -- all he had received by exercising his options and more -- on June 12, 2017 (SLC Report at 32);

   b.   Aflac purchased its shares on the market as part of its repurchase program on June 13, making it a contemporaneous purchaser for purposes of Section 20A (*id.* at 63);

---

[1]      The public release of the SLC Report has waived any privilege otherwise protecting the subject matter of the SLC Report and the investigation leading up to it, opening them up to discovery, including deposition of witnesses interviewed by the SLC counsel.

    c.  At the time of the purchase, Defendant Amos II had knowledge of Plaintiffs' December 10, 2016 allegations (*id.* at 33) including, inter alia:

        i.  the AWP allegations (*id.* at 45);

        ii.  the SBA allegations (*id.* at 60);

        iii.  FY2015 with 9 additional days in it (*id.* at 61).

15.    On January 18, 2018, Plaintiffs' was advised of the existence of Aflac's Regulatory Settlement Agreement with the States of Idaho, Missouri and Minnesota dated May 2012 (the "2012 RSA"), and that the 2012 RSA itself was publicly available on the States' insurance departments' websites (**Exhibit 4**).

16.    The 2012 RSA refers to many areas of regulatory concerns with Aflac's business practices, including such practices as sales of duplicative coverage, "overselling," and "sales that are . . . conversion of existing coverage" among 14 specifically identified categories of violations; imposes a $1.6 million penalty – upon information and belief, the largest statutory penalty (so far) in Aflac's history; requires the Company to implement a Corrective Action Plan calling for a major overhaul of Aflac's "claims handling, sales and marketing procedures, and agent supervision and compensation practices"; and submits Aflac to an intrusive three-year regulatory monitoring of its compliance with those requirements. (Upon information and belief, the contracting States have now reopened their market conduct examination of Aflac). Neither Plaintiffs nor their counsel were previously aware of the 2012 RSA.

17.    The SLC Report does not mention the overselling or conversion claims alleged by Plaintiffs in the Dispute Notice -- yet, Aflac had apparently paid significant statutory penalties for those very same violations, among others, without admitting or denying them, and agreed to correct them in the 2012 RSA. Accordingly, Aflac's public statements that the Company or the SLC has investigated Plaintiffs' allegations and found them all to be "false" and "without merit"

fly in the face of the 2012 RSA executed by Aflac itself, and are merely a part of Defendants'
continuing whitewash and coverup. In turn, Plaintiffs' 2016-17 allegations demonstrate that
Aflac has not complied with the 2012 RSA because it has continued to commit the very same
violations to this very day.

18.     The next two weeks of January 12 were dominated by positive news about Aflac.
Thus, on January 19, 2018, Aflac issued a press release announcing its 17th annual nomination
by Fortune magazine to the list of "The World's Most Admired Companies," giving Defendant
Amos an occasion to comment: "This honor provides third-party validation that our business
model, which has made us the industry leader serving more than 50 million people in the United
States and Japan, remains strong." Aflac announced the "Long Live Music" experience on
January 24, 2018; and the mainstream media was discussing Aflac's charitable activities.
Nevertheless, the stock price has not recovered the ground lost on January 12, and resumed its
slide on Monday, January 29, 2018, closing at $88.57 on January 30, 2018.

19.     In sum, after the news of the scandal broke and the stock price plummeted,
Defendants engaged in a concerted effort to discredit and minimize Plaintiffs' allegations
through a series of publicly released misleading statements -- the January 12 Press Release, the
January 16 Form 8-K, and the SLC Report released on January 16 (the "2018 Releases") -- at the
costs of waiving the attorney-client privilege attached to the SLC Report, and all in an effort to
comfort the market that the Company and its Board had thoroughly investigated Plaintiffs'
allegations and found them all "false" and "without merit," so that there was nothing to see there,
and everyone should just move right along to keep admiring one of the "World's Most Admired
Companies" for the umpteenth year in a row.

20.     These 2018 Releases were knowingly false and misleading; they provided false and fleeting comfort to the market; and they were an integral part of Defendants' whitewash and cover-up scheme -- in the words of Rule 10b-5, "a device, scheme, or artifice to defraud" -- that commenced in December 2016 and is now approaching its final throes.

## NATURE OF THE ACTION

21.     Plaintiffs bring this derivative action (the "Action") against members of Aflac's Board of Directors, the executive directors Defendants Daniel P. Amos, CEO and Chairman of the Board of Aflac, and his son Defendant Paul S. Amos, II, President of Aflac (collectively, "Defendants Amoses"), as well as independent directors Defendants Douglas W. Johnson, Charles B. Knapp, Barbara K. Rimer, Elizabeth Hudson, W. Paul Bowers, Joseph L. Moskowitz and Melvin T. Stith (the "Director Defendants"), all of whom had actual knowledge of the pervasive fraud committed at the Company as alleged by the Plaintiffs, and either directly participated in, had direct knowledge of, or knowingly failed to prevent or remedy that fraud; issued or caused to be issued materially false and misleading statements in the Company's 2017 Proxy, its FY2016 Annual Report, and the 2018 Releases in an effort to cover it up; engaged in insider trading while in possession of material nonpublic Company information; and authorized an extraordinary 56 million share repurchase in July-August 2017, artificially boosting the Company's stock price and increasing the value of Defendants' Aflac securities, all in breach of their fiduciary duties to Aflac and its shareholders and in violation of federal and state laws.[2]

22.     In this Action, Plaintiffs intend to prove:

    a.   that each Defendant had ***actual knowledge*** of the pervasive fraud at Aflac alleged
         by the Plaintiffs in great factual detail, with supporting documents and

---

[2]     Defendant Directors Moskowitz and Stith were not named in the original complaint but had received Plaintiffs' March 8, 2017 submissions as the other Defendant Directors (**Exhibits 5-6**), and have been added as defendants to this amended complaint.

eyewitnesses, but deliberately, consciously and recklessly disregarded that knowledge, concealed the truth from the market, and made or caused to be made false and misleading statements to the public in Aflac's FY2016 Annual Report published on February 24, 2017; its 2017 Proxy published on March 17, 2017; and its 2018 Releases published in January 2018;

b. that each Defendant knew that some of the most blatant violations alleged by the Plaintiffs had since been confirmed by the Company's purported remedial actions, which actions were in fact all designed and executed to cover up rather than remedy the problems;

c. each Defendant issued or caused to be issued materially false and misleading 2017 Proxy, FY2016 Annual Report, and the 2018 Releases in reckless disregard for the fact that the Company's own internal investigation of the alleged fraud was demonstrably a hasty whitewash and that the Company's purportedly remedial actions had since implicitly confirmed the merits of the fraud allegations;

d. that the Director Defendants unreasonably and recklessly relegated the investigation of Plaintiffs' allegations to the law firm of Alston & Bird, LLP, which firm was retained to represent not only the Company and Defendants Amoses, as well as other senior executives of the Company named as defendants in Plaintiffs' related DOL complaint, but also the Director Defendants themselves. The severe conflict of interests on the part of Alston & Bird inherent in such multiple representations of both the Company executives alleged to have committed or condoned the fraud and the independent directors elected by the

shareholders to supervise those executives, appears manifest (and unconsentable), as is the conscious dereliction of duties on the part of the Director Defendants;

e.  that the Director Defendants unreasonably and recklessly recommended the re-election of Defendant Amos, II, in the 2017 Proxy despite Plaintiffs' allegations, supported by documents, directly tying Defendant Amos, II, to one of the fraudulent schemes perpetrated at Aflac -- only to accept his sudden resignation a month later, and then watch him sell $17 million worth of Aflac stock before the ink had dried on his resignation letter while at the same time authorizing an extraordinary repurchase of 56 million of its own shares in July-August 2017, thereby artificially boosting Aflac's stock price and the value of Aflac's securities held by Defendants; and

f.  that these very same Director Defendants then rejected the Plaintiffs' demand to investigate and prosecute Defendant Amos, II, for his blatant insider trading as "not in the best interests of the Company," and continued their whitewash and coverup with their 2018 Releases.

23.  In sum, faced with the direct and substantiated evidence of a pattern of fraudulent practices at the Company conducted with the participation and/or knowledge of the Company's top executives Defendants Amoses, the Director Defendants, in utter dereliction of their duties, failed properly to investigate those fraudulent practices and the deficient internal controls that allowed the misconduct to occur; failed to disclose that misconduct, including its impact on Aflac's financial results and key operational metrics reported in its SEC filings and other public statements, to the shareholders, regulators, and other market participants; and did nothing to bring the misconduct to an end choosing instead to cover it up, contrary to the best interests of

the Company, in breach of their fiduciary duties and in violation of the applicable state and federal laws.

24.     Accordingly, Plaintiffs bring these derivative claims on behalf of the nominal defendant Aflac pursuant to Rule 23.1 of the Federal Rules of Civil Procedure seeking to hold Defendants liable to the Company for violations of Sections 10(b), 14(a) and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as for breaches of fiduciary duties and unjust enrichment.

## JURISDICTION AND VENUE

25.     This Court has subject matter over this action pursuant to 28 U.S.C. § 1331 because this action involves federal questions. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

26.     Venue lies under 28 U.S.C. § 1391(b) and (c) because nominal Defendant Aflac conducts business in this district, it stock trades on the NYSE located in this district, the alleged insider sales took place in this district, and a substantial part of the events giving rise to this action occurred in this district.

27.     The derivative claims satisfy the requirements of Rule 23.1 in that (a) each Plaintiff was a shareholder of the Company at the time of the complained-of transaction and at the time of this complaint; (b) the action is not a collusive one to confer jurisdiction that the Court would otherwise lack; and (c) the complaint state with particularity Plaintiffs' efforts to obtain the desired action from the Company's Board of directors.

28.     Plaintiffs, through their counsel, have conducted an investigation into the facts supporting the allegations in this Complaint and believe discovery will elicit further evidentiary support for their allegations.

## THE PARTIES

29.     Plaintiff Conroy is a shareholder of Aflac and a former sales associate of American Life Assurance Company of Columbus, a wholly owned operating subsidiary of Aflac (Plaintiffs refer to both as "Aflac" unless the context requires otherwise). Plaintiff Conroy was a District Coordinator for Aflac for nine years until 2016, having been honored as a President's Club coordinator for four of those years, and having received numerous state and national awards and recognitions during his successful career at Aflac.

30.     At the end of 2015, Plaintiff Conroy reported a fraud being committed on Aflac's New York Sergeants' Benevolent Association ("SBA") account directly to Defendant Daniel Amos. Notwithstanding the fact that Aflac's subsequent internal investigation confirmed Plaintiff Conroy's allegations, the Company failed to report those confirmed violations to the New York Insurance Department; none of the culprits have been demoted, terminated, or otherwise held responsible; indeed, the only person whom Aflac punished was Plaintiff Conroy, the whistleblower himself.

31.     Plaintiff Conroy also witnessed firsthand a number of other improper or fraudulent practices discussed below, including the manipulation of the "average weekly producers" or "average monthly producers" metric (the "AWP scheme"), and the conversion of pre-existing individual policies into nearly identical new group policies (the "Individual-to-Group Conversion"), also reported directly to Defendants Amoses.

32.     Plaintiff Conroy is a resident of New York, and is the owner of 28.1531 shares of Aflac stock. Plaintiff Conroy has continuously owned his Aflac stock at all times relevant hereto and continues to be an Aflac shareholder today. Plaintiff Conroy's allegations in this verified

amended complaint, as they relate to his acts, are made upon personal knowledge as to himself and his acts, and upon information and belief as to all other allegations.

33.     Plaintiff McCarthy joined Aflac in 2001 after 27 years of police service for the City of Jersey City, where he served as the Director of the Police Department. Plaintiff McCarthy held numerous management positions at Aflac, including those of a District Sales Coordinator and a Regional Sales Coordinator; produced over $25 million in premiums for the Company; and have won nearly every award achievable on a state and national levels during his successful career with Aflac. In 2016, Plaintiff McCarthy suffered a severe loss of income and financial injury in connection with the improper Individual-to-Group Conversion of several of his large existing accounts. Even though Plaintiff McCarthy reported these improper practices to Aflac's CEO and Chairman Defendant Daniel Amos, the latter ignored Plaintiff McCarthy's complaints; Aflac offered no compensation for his losses; the Individual-to-Group Conversion practice has continued unabated.

34.     Plaintiff McCarthy is a resident of Florida, and is the owner of 17.86 shares of Aflac stock. Plaintiff McCarthy has continuously owned his Aflac stock at all times relevant hereto and continues to be an Aflac shareholder today. Plaintiff McCarthy's allegations in this verified amended complaint, as they relate to his acts, are made upon personal knowledge as to himself and his acts, and upon information and belief as to all other allegations.

35.     Plaintiff Varela worked as Aflac's sales associate for three years until his termination by Aflac in May 2017. Plaintiff Varela suffered financially when a number of his accounts were improperly converted and taken away from him by his Aflac supervisors while he was at Aflac. Plaintiff Varela was terminated by Aflac in retaliation after this dispute has arisen

and following his demonstration of Aflac's fraudulent overselling practice through its proprietary SNG system to New York state investigators.

36.     Plaintiff Varela is a resident of New York, and is the owner of eight shares of Aflac stock, which he acquired in 2015-16, and is a former sales associate of Aflac. Plaintiff Varela has continuously owned his Aflac stock at all times relevant hereto and continues to be an Aflac shareholder today. Plaintiff Varela's allegations in this verified amended complaint, as they relate to his acts, are made upon personal knowledge as to himself and his acts, and upon information and belief as to all other allegations.

37.     Nominal defendant Aflac is a holding company that provides supplemental insurance products in the U.S. through its operating subsidiary American Life Assurance Company of Columbus, and in Japan through its branch Aflac Japan.

38.     Aflac is a company organized and existing under the laws of the State of Georgia. Aflac is traded on the New York Stock Exchange under the ticker symbol "AFL."

39.     Aflac does business in the State of New York from its regional headquarters at 14 Wall Street, New York. The Company is well-known for its Duck commercials, and is recognized as "the most ethical company globally" by Ethisphere Institute for 11 years in a row and as of the "world's most admired companies" by Fortune Magazine for 17 years in a row.

40.     In 2012, Aflac entered into the 2012 RSA with the states of Minnesota, Missouri, and Idaho following those states' three-year-long market conduct investigation of the "Company's sales and marketing, producer licensing, complaint handling, and claims practices," with fourteen specific areas of regulatory concerns including "sales of duplicate coverage," "overselling," and "sales that are conversion of existing coverage."

41.     The 2012 RSA resulted in the largest statutory fine in the Company's history --
$1.6 million; a significant Corrective Action Plan requiring a major overhaul of Aflac's sales
practices – "with regards to claims handling, sales and marketing procedures, and agent
supervision and compensation practices" – as well as a three-year regulatory monitoring of
Aflac's compliance with the 2012 RSA.

42.     Upon information and belief, Aflac is not in compliance with the 2012 RSA.
Indeed, Plaintiffs' allegations made in their December 2016 – March 2017 submissions raise the
very same violations – *e.g.*, overselling and conversion, among others – that were specifically
identified in the 2012 RSA as the areas of regulatory concern requiring corrective actions by
Aflac, but were apparently not corrected, and continue to this day. Further upon information and
belief, the 3 states-parties to the RSA have opened another market examination of Aflac in 2017,
which is still ongoing.

43.     Defendant Amos is the current CEO and Chairman of the Board of Aflac, and has
served in these positions at all relevant times. In fact, Defendant Amos served as the Company's
CEO since 1990, and as Chairman of its Board since 2001. Defendant Amos is the son of one of
the three brothers-founders of Aflac. Defendant Amos has been named one of America's Best
CEOs in the life insurance category five times by the Institutional Investor magazine, and among
the World's Best Performing CEOs by Harvard Business Review in 2015 and 2016.

44.     Defendant Amos, II, the son of Defendant Amos, was the President of Aflac since
2007 and a member of its Board of Directors during the relevant period until his abrupt
resignation from the Board and the Company, as well as from all of the Company's affiliates and
subsidiaries, announced by Aflac on June 8, 2017. Prior to that day, Defendant Amos, II, was
considered "the potential third-generation heir to his father Dan Amos."

45.     On June 12, 2017, Defendant Amos, II, sold 222,889 shares of Aflac on the New York Stock Exchange for over $17 million. On June 13, 2017, Aflac purchased its own shares on the open market as part of its corporate share repurchase program.

46.     Defendant Johnson is the lead non-management director of Aflac and the Chair of its Audit and Risk Committee, and has served in this position at all relevant times.

47.     According to its Charter, the Audit and Risk Committee is appointed by the Board "to assist the Board in fulfilling its oversight responsibilities." Among the primary duties of the Committee are to "oversee that management has maintained the reliability and integrity of the financial reporting process and systems of internal controls of the Company and its subsidiaries regarding finance, accounting and legal matters," "assist Board oversight of the Company's compliance with legal and regulatory requirements," and "prepare the disclosure that is required to be included in the Company's annual proxy statement."

48.     The Charter also provides that the Audit and Risk Committee "has the authority to conduct any investigation appropriate to fulfilling its responsibilities." As shown, Defendant Johnson as the Chair of the Audit and Risk Committee recklessly abdicated that authority by relegating the investigation of the alleged fraud to the Company's thoroughly conflicted outside counsel Alston & Bird.

49.     Defendant Knapp is a non-management director of Aflac Inc. and the Chair of its Finance and Investment Committee, and has served in this position at all relevant times.

50.     Defendant Rimer is a non-management director of Aflac Inc. and the Chair of its Corporate Governance Committee, and has served in that position at all relevant times.

51.     According to its Charter, "the purposes of the Corporate Governance Committee (the 'Committee') of the Board of Directors (the 'Board') of AFLAC Incorporated (the

'Company') shall be to select individuals qualified to serve as directors of the Company and to recommend to the Board directors qualified to serve on committees of the Board; to advise the Board with respect to the Board composition and procedures; to develop and recommend to the Board a set of corporate governance principles applicable to the Company; to assist the board in developing and evaluating potential candidates for executive positions; to develop and review senior management talent and succession plans; and to oversee regular evaluations of the Board."

52.     Defendant Hudson is a non-management director of Aflac and the Chair of its Sustainability Committee, and has served in that position at all relevant times.

53.     Defendant Bowers is a non-management director of Aflac and the Chair of its Corporate Development Committee, and has served in that position at all relevant times.

54.     Defendant Moskowitz in a non-management director of Aflac and has served in that position at all relevant times.

55.     Defendant Stith is a non-management director of Aflac and has served in that position at all relevant times.

56.     All of the Defendant Directors were put on notice of the alleged fraud at the Company by Plaintiffs' counsel's letters to each of them dated March 8, 2017, which included Plaintiffs' Dispute Notice and their SEC, IRS and DOL submissions.[3]

---

[3]     Plaintiffs' letter to Melvin T. Stith was mistakenly addressed to "Melvin T. Smith" (**Exhibit 6**) but apparently found its way to the intended addressee.

## FACTS

**A.      Plaintiffs allege massive fraud committed with the
knowledge and/or participation of Defendants Amoses.**

57.      On December 10, 2016, a diverse group of seven former and current Aflac sales

associates, including the Plaintiffs, through their counsel sent the Dispute Notice to Aflac's CEO

and Chairman of the Board Defendant Amos, to Aflac's President and Board member Defendant

Amos, II, and to Aflac's General Counsel Audrey Boone Tillman. **Exhibit 3.**

58.      The 16-page single-spaced Dispute Notice stated: "our clients allege consistently,

credibly, and with supporting evidence, that Aflac has been engaged in a range of unfair and

deceptive business practices. Their allegations reveal a pattern of misconduct that may constitute

securities fraud, commercial fraud, consumer fraud, insurance fraud, violations of the Sarbanes-

Oxley Act and the Dodd-Frank Act, violations of state insurance laws and regulations, and other

wrongdoings. Aflac has been engaged in these improper practices for its own benefit and that of

its top management, and to the detriment of its associates, customers, and shareholders." *Id.*

59.      Among numerous other wrongdoings, the Dispute Notice alleged Aflac's

manipulation of its "key operational metrics" – (a) the number of "average weekly producers,"

*i.e.*, sales associates actively selling Aflac insurance during the reporting period, and (b) the

"new annualized premiums" – which Aflac had represented to the market as important markers

of the Company's growth and earnings potential.

### a.   The AWP metric manipulation

60.      Aflac has been touting its "average producer" number to its shareholders and

analysts as an important driver of its growth since at least 2007 and until its unexplained

disappearance in 2017 following Plaintiffs' allegations. For example, this is how Defendant

Amos, II, described it during the Financial Analysts Briefing in 2013:

Our career sales associate channel is a team of more than 76,000 sales associates who are the driving force behind the relationships we've developed with hundreds of thousands of the nation's small businesses. For years, other companies have tried to replicate and, in some cases, even buy a sales distribution channel like ours. We regard our success in the small business market as essential to our operating model. With our career associates driving this success, we're going to continue to protect, enhance and empower them to adapt to the difficult sales environment they've faced for the past several years. Recruiting the right candidates – and the right number of candidates – is an important driver to sales. To support and maintain robust recruiting levels, we focused the last few years on expanding our coordinator base to better meet the management and development needs of our new recruits. Accomplishing this will strengthen our sales management capabilities and empower us to increase the number of successful producers with the ultimate goal of extending our reach to our customers.

61.    In its Annual Report for FY2015, Aflac stated: "At the end of 2015, our extensive distribution network was made up of more than 40,000 monthly average producers." In its Annual Report for FY2016, Aflac stated: "At the end of 2016, our extensive distribution network was made up of more than 9,000 average weekly producers."

62.    In reality, the number of producers was inherently inflated due in part to the fraudulent practice of manipulating the "average producer" metric by assigning as low as $1 in fake production in the names of so-called "zero producers," as set out in the Dispute Notice. The Dispute Notice also alleges that Defendant Amos II was instrumental in instituting the metric even though he was forewarned that the sales force would easily manipulate it, citing a 2010 email exchange between Defendant Amos II and Plaintiff Conroy where the latter warned the former that "AWP is, with all due respect, a 'bull pucky' number. There are too many ways to manipulate the figure." **Exhibit 3** at 8.

63.    The SLC Report itself admits that Paul Amos "was instrumental in instituting the nationwide use of the average weekly producer metric to better track the number of associates who were actively selling Aflac policies. He wanted to incentivize his team not simply to recruit

new sales associates, but to recruit associates who would produce business on a regular basis. The AWP metric was designed to track the progress towards that goal because it counted how many associates produced each week." SLC Report (**Exhibit 2**) at 40.

64.     The Dispute Notice further alleged that Aflac CEO and Chairman of Aflac's Board of Directors Defendant Amos himself had also been well aware of and failed to prevent fraud at the Company.

### b.  The Individual-to-Group Conversion

65.     As cited in the Dispute Notice (**Exhibit 3**), Plaintiff McCarthy complained about the practice of converting existing individual policies into nearly identical group policies in a letter to Defendant Amos dated September 28, 2016.

66.     As pointed out in Plaintiff McCarthy's letter and appears undisputed, cannibalizing its own existing $600,000 worth of individual coverage with new $100,000 in substantially identical group coverage makes no economic sense. The only plausible explanation for this Individual-to-Group Conversion is to allow Aflac to report the $100,000 as its "new annualized premium sales," which is admittedly among the key indicators of the Company's growth rates and earning prospects, without disclosing that Aflac's "new" premium is in fact the result of cannibalizing Aflac' own existing business.

67.     "I am very pleased with our fourth quarter new annualized premium sales, which hit an all-time record," said Defendant Amos in remarking on $496 million in new premiums in the FYQ4 2015. *See also* SLC Report at 34 (Defendant Johnson is cited as follows: "in his view, analysts are more concerned about other [than AWP] metrics, such as the New Annualized Premium metric." Upon information and belief, the analysts do not know about Aflac's conversion practice, also cited as a violation in the 2012 RSA.

### c. **The SBA fraud**

68.     The Dispute Notice alleges that Defendant Amos knew about Aflac's fraudulent practice of issuing policies on its New York SBA account for the NYPD sergeants to the unqualified regular patrolmen, falsely certifying that they were members of the SBA. As described in the Dispute Notice, Plaintiff Conroy first reported the SBA fraud directly to Defendant Amos in December 2015; Aflac then appointed its special investigator Bill Capps to investigate Plaintiff Conroy's allegations; and Mr. Capps' investigation ***confirmed*** the alleged violations, with Mr. Capps writing to Plaintiff Conroy on July 8, 2016: "I completed the SBA file[,] confirmed allegations -- there have been multiple meetings between legal, Compliance and sales -- still ongoing."

69.     Despite the fact that Mr. Capps' investigation confirmed Plaintiff Conroy's allegations that Aflac had been knowingly issuing policies to the New York City employees not qualified for such policies in violation of the state insurance regulations, the Company failed to report the confirmed violations to the New York Insurance Department or the City of New York; none of the culprits involved had been demoted or otherwise held responsible; indeed, the only person whom Aflac punished was Plaintiff Conroy, whom it retaliated against following his complaint to Defendant Amos.

### d. **The SNG fraud and other overselling practices**

70.     The Dispute Notice also alleged, *inter alia*, the SNG fraud whereby Aflac issued its policies to policyholders without their knowledge, authorization or consent – much like Wells Fargo's "cross-selling" fraud -- with the use of Aflac's proprietary SNG computer interface and laptops.

71.     Plaintiff Varela, who was instrumental in bringing this fraud to light, was requested by Aflac to return his SNG laptop within hours of his demonstrating it for the New York City Comptroller's Office investigators, and was terminated by the Company within a few months thereafter in another instance of whistleblower retaliation.

72.     Finally, the Dispute Notice alleged other fraudulent activities and practices at the Company; indeed, the Dispute Notice described six broad categories of the alleged violations, including in addition to those discussed above the illegal bundling of stand-alone policies; misclassification of employees as independent contractors; sexual harassment; whistleblower retaliation; and the institutionalized theft of commissions through "sit codes" manipulation.

**B.      Aflac's and its Director Defendants' responses to fraud allegations – a deliberate whitewash protecting Defendants Amoses.**

**a.   Aflac denies the allegations in bad faith.**

73.     On December 14, 2016, Aflac responded to the Dispute Notice through its in-house counsel Catherine Coppedge, stating that "we take these allegations seriously and will be looking into them thoroughly." Declaration of Dimitry Joffe dated December 14, 2017 ("Joffe Decl."), ECF No. 1-1 Ex. B.

74.     Aflac's initial promise to take the allegations seriously – as it should have done anyway – quickly turned out to be a mockery, for barely three weeks later, on January 5, 2017, Aflac sent another letter to the Plaintiffs' counsel stating that "Aflac unequivocally denies the allegations raised in your December 10, 2016 letter," and labelling them "wholly without merit." Joffe Decl., ECF No. 1-1 Ex. C.

75.     It is implausible that Aflac had "look[ed] into [the allegations] thoroughly" during the three-week holiday period and had formed any good-faith basis during that period for denying them as "wholly without merit."

76.     Indeed, as described herein, Aflac itself admitted in September 2017 that it did

not have in its possession at least some of the key incriminating documents cited in the Dispute

Notice. In particular, Aflac did not have the 2010 emails between Defendant Amos II and

Plaintiff Conroy (quoted in ¶ 62 above) implicating Defendant Amos, II, in the AWP scheme.

The SLC Reports itself admits that despite collecting hundreds of thousands of documents, these

key emails were missing and provided to the SLC counsel by the undersigned only in September

2017. Accordingly, Aflac could not have properly investigated those allegations in December

2016-January 2017, and had denied them in bad faith.

### b.  Having denied the allegations in bad faith, Aflac implicitly admits their merits.

77.     On January 27, 2017, three weeks after denying Plaintiffs' allegations as "wholly

meritless," Aflac internally decommissioned the AWP reports alleged by Plaintiffs in the Dispute

Notice to be fraudulent:



78.     Then, in its FY2016 Annual Report published on February 24, 2017, Aflac –

without any explanation -- dropped the average producers number from the list of its "key

operational metrics," and restyled the list itself as "key sales metrics." Here is how Aflac

reported the "monthly average producers" metric in its Year in Review Report for FY2015:

AFLAC U.S. – KEY OPERATIONAL METRICS

| | POLICIES AND CERTIFICATES IN FORCE* | ANNUALIZED PREMIUMS IN FORCE** | TOTAL NEW ANNUALIZED PREMIUM** | MONTHLY AVERAGE PRODUCERS |
|---|---|---|---|---|
| 2015 | 12,498 | $5,760 | $1,487 | 40,092 |
| 2014 | 12,407 | 5,668 | 1,433 | 40,476 |
| 2013 | 12,310 | 5,570 | 1,424 | 41,605 |
| 2012 | 12,232 | 5,451 | 1,488 | 44,398 |
| 2011 | 11,732 | 5,188 | 1,476 | 45,188 |
| 2010 | 11,436 | 4,973 | 1,382 | 45,113 |
| 2009 | 11,688 | 4,956 | 1,453 | 48,292 |
| 2008 | 11,437 | 4,789 | 1,551 | 48,402 |
| 2007 | 11,116 | 4,510 | 1,558 | 46,818 |
| 2006 | 10,519 | 4,101 | 1,423 | 44,482 |

*In thousands
**In millions

Aflac Incorporated Year in Review 2015 | **29**

79.     And this is how, following Plaintiffs' revelations, Aflac dropped the metric in its FY2016 Year in Review report, while restyling the list itself as "key sales metrics":

AFLAC U.S. – KEY SALES METRICS

| | POLICIES AND CERTIFICATES IN FORCE* | ANNUALIZED PREMIUMS IN FORCE** | TOTAL NEW ANNUALIZED PREMIUM** |
|---|---|---|---|
| 2016 | 12,692 | $5,896 | $1,482 |
| 2015 | 12,498 | 5,760 | 1,487 |
| 2014 | 12,407 | 5,668 | 1,433 |
| 2013 | 12,310 | 5,570 | 1,424 |
| 2012 | 12,232 | 5,451 | 1,488 |
| 2011 | 11,732 | 5,188 | 1,476 |
| 2010 | 11,436 | 4,973 | 1,382 |
| 2009 | 11,688 | 4,956 | 1,453 |
| 2008 | 11,437 | 4,789 | 1,551 |
| 2007 | 11,116 | 4,510 | 1,558 |

* In thousands
** In millions

80.     The decommissioning of the AWP reports, followed by the disappearance of that metric from Aflac's public filings, constitutes an implicit admission by Aflac that Plaintiffs' allegations had merits. However, this disappearance of the erstwhile "key operational metric" does not constitute a corrective or remedial action by the Company – as shown above, it was done in a stealth manner and without any explanation, apparently in an effort to sweep the issue

under the rug as part of the Company's whitewashing efforts rather than to fix the underlying problem.

81.     Furthermore, during the same period, Aflac removed from its website the recruiting video that the Dispute Notice specifically identified as fraudulent. In that video, Trevor Fennell of Aflac claimed that "there is a lot of money to be made at Aflac. I am not shy about it at all because it is a big part of bringing someone onboard."

82.     As alleged in the Dispute Notice, Aflac indeed fraudulently promised its new recruits "a lot of money to be made at Aflac" – specifically, in 2016 Aflac had been promising a $125,000 first-year commission to candidates with no experience. As demonstrated in the Dispute Notice, Aflac's recruiting program was a fraud as the commission figures that Aflac had been promising its recruits did not even remotely resemble the reality and were based on the knowingly false and fraudulent assumptions.

83.     In another tacit admission that the Dispute Notice allegations had merits, Aflac during the same period revamped its recruiting program, now promising its first-year associates an average compensation of $64,000 – itself a false and fraudulent number but a far cry from the $125,000 it had been promising just a few months earlier.

**C.     Director Defendants' dereliction of duties in response to the fraud allegations.**

84.     On March 8, 2017, Plaintiffs through counsel reported the alleged fraud to the Company's independent directors, including its lead non-management director and Chair of its Audit and Risk Committee Defendant Johnson; Chair of Finance and Investment Committee Defendant Knapp; Chair of the Corporate Governance Committee Defendant Rimer; Chair of Sustainability Committee Defendant Hudson, and Chair of Corporate Development Committee

Defendant Bowers, and Defendants Moskowitz and Stith. Joffe Decl., ECF No. 1-1 Ex. D; **Exhibit 5** (letter to Defendant Moskowitz); **Exhibit 6** (letter to Defendant Stith).

85.     Plaintiffs' March 8, 2017 submission to the independent directors attached the Dispute Notice, as well as copies of Plaintiffs' whistleblower submissions to the SEC, the IRS, and the DOL, which submissions included additional allegations of serious misconduct at the Company, including (a) misclassification of Aflac's sales associates as independent contractors, (b) an undisclosed slush fund, and (c) tax violations in Aflac's Section 125 pre-tax policies, and stated (*id.*):

> We believe our clients' allegations laid out in these submissions are credible, well-supported by evidence, and raise extremely grave concerns about the conduct of the current executive management of the Company. On January 6, 2017 – less than a month after our Dispute Notice – AFLAC responded by denying all our allegations as "wholly without merit" (Exhibit F). It is simply inconceivable that the management had properly investigated our detailed allegations, given the scope and breadth of the alleged wrongdoings, and determined in good faith that they were all without any merit.

> We believe it is incumbent upon the independent directors of AFLAC, and consistent with their fiduciary duties, to conduct a proper internal investigation of our allegations without any interference by the executive directors or management, in particular Messrs. Daniel Amos, Paul Amos II, and other AFLAC executives expressly alleged in the Dispute Notice to have been personally aware of and/or participated in the fraud. We are happy to cooperate with and assist the independent directors in their investigation.

86.     The lead non-management director Defendant Johnson responded to Plaintiffs' appeal on March 20, 2017, confirming that Plaintiffs' March 8, 2017 submission was being delivered to the addressee Directors, and revealing that "***the Board had previously been advised of the allegations raised in your December letter and on the company's due diligence efforts.***" Joffe Decl., ECF No. 1-1 Ex. E. Defendant Johnson then relegated Plaintiffs to "Ms. Lisa H.

Cassilly, with the law firm of Alston & Bird, LLP, [who] has been retained to represent Aflac."

*Id.*

87.     In fact, as Ms. Cassilly herself subsequently albeit reluctantly admitted, Alston &

Bird, LLP, was retained to represent not only the Company itself, and not only Defendants

Amoses and other executives accused of fraud and whistleblower retaliation, but also the

independent board members presumably investigating those accusations at the same time,

notwithstanding the apparent conflict of interests inherent in such representation.

88.     The significant admission by Aflac's lead non-management director Defendant

Johnson – *i.e.*, that the Board had been aware of Plaintiffs' allegations and the Company's

purported investigations thereof prior to the publication of the 2017 Proxy -- prompted the

following response from Plaintiffs on March 28, 2017. Joffe Decl., ECF No. 1-1 Ex. F:

> Just three days prior to your letter, on March 17, 2017, AFLAC published
> its annual proxy statement and filed the corresponding Form DEF14A
> with the SEC. The proxy statement included your letter "to my fellow
> shareholders," executed in your capacity of a lead non-management
> director of AFLAC, and a report from the Audit and Risk Committee that
> you chair.
>
> In your letter to shareholders, you encourage Aflac shareholders to vote
> for the slate of directors including the current executive management of
> the company, alleged in our December letter to have committed massive
> fraud at the company.
>
> The Audit and Risk Committee Report, in turn, states that the "Committee
> has recommended to the Board of Directors, and the Board has approved,
> the audited financial statements to be included in the Company's Annual
> report on Form 10-K for the year ended December 31, 2016, for filing
> with the SEC" – financial statements alleged to have been based on fraud.
>
> It follows from these premises that you personally, the Audit and Risk
> Committee, and the full Board had approved AFLAC's 2016 financial
> statements while internally aware of our allegations that those statements
> were fraudulent. By contrast, Aflac shareholders reading those publicly
> released financial statements would have had no clue that something might
> be seriously amiss at the company.

The Audit and Risk Committee Report also states that "in its oversight role *the Audit and Risk Committee relies on the work and assurances of the Company's management*, which has the primary responsibility for establishing and maintaining adequate internal controls over financial reporting and for preparing the financial statements . . . ." (emphasis added).

It appears that the Company's management had provided the Board -- and you personally -- with false assurances regarding the scope, extent, or veracity of our allegations, most likely in an effort to minimize or cover up its own alleged fraud.

89.     Plaintiffs' March 28, 2017 letter to the Director Defendants further stated: "It is simply inconceivable that the Audit Committee could have made the statements it made in the Committee report had it been sufficiently and truthfully apprised of our allegations and of the company's true financial position by the management. Being misled by management regarding our very serious allegations made against the company should furnish a more than sufficient justification for the Board to remove the management from its position forthwith." *Id.*

90.     Plaintiffs' March 28, 2017 letter concluded by requesting the Board, again, to "investigate our allegations in good faith, and take all the necessary corrective actions." *Id.*

91.     To the best of Plaintiffs' knowledge, the Board did not conduct any such good-faith investigation at the time and did not take any corrective actions; none was disclosed to the Plaintiffs, or to the Company's shareholders in general.

92.     Indeed, none of the public filings made by Aflac during that period disclosed any of the alleged fraud, or the Company's inadequate responses to those allegations, or the true reasons behind the dropping of the AWP operational metric or the revamping of the recruiting program, both alleged fraudulent by the Plaintiffs.

**D.      Defendants made or caused to be made materially false and misleading public statements in the 2017 Proxy and FY2016 Annual Report.**

### a.   Aflac's 2017 Proxy is false and misleading.

93.      Aflac's 2017 Proxy published on March 17, 2017 was deliberately false and misleading because Defendants omitted material facts regarding the alleged fraud at the highest echelons of the Company. While omitting those facts, Defendant Johnson in his letter to shareholders executed in his capacity as Aflac' lead non-management director and included in the 2017 Proxy encouraged Aflac shareholders to vote for the slate of directors nominated by the Board's Corporate Governance Committee, including Defendants Amoses, even though he was personally aware of the serious, credible and potentially grave allegations against them raised by the Plaintiffs and implicitly confirmed by Aflac's subsequent actions.

94.      The Board's Corporate Governance Committee headed by Defendant Rimer also assured shareholders in the 2017 Proxy that all nominees to the Board, including Defendants Amoses, were selected on the basis of their "***impeccable record and reputation for honest and ethical conduct in both professional and personal activities***." Plaintiffs' allegations implicating Defendants Amoses at the very least raised glaring red flags about their "impeccable record and reputation for honest and ethical conduct," which red flags were deliberately and recklessly ignored by Defendant Rimer and the other Director Defendants.

95.      The 2017 Proxy also stated that the director nominees, including Defendants Amoses, "have been nominated by the Corporate Governance Committee of the Board of Directors and, if selected, are willing to serve until the next Annual Meeting of Shareholders and until their successors have been selected and qualified. . . . ***The Board of Directors has no reason to believe that any of the nominees will be unable or unwilling to serve***."

96.     In fact, Aflac's President Defendant Amos, II, resigned a month after being re-elected to the Board, and it is wholly implausible and counterintuitive that a 41-year-old President of "the world's most ethical company," ranked Fortune 127th with a $28-billion market cap and a household brand name, the son of the Company's CEO and Chairman and the grandson and grandnephew of its founders, who had been with the Company since his teenage years and was regarded as "the potential heir apparent to his father Dan Amos" would suddenly retire to work at a small-business private equity fund in Columbus, Georgia, as the Company announced in its June 8, 2017 press release. Wholly implausible and counterintuitive, that is, but for the fraud and misconduct alleged by the Plaintiffs and concealed by the Defendants as the true reason for Defendant Amos, II's departure for the Company.

97.     What is more, contrary to its representation, the Board has had plenty of reasons to believe at the time that Defendants Amoses, or at least Defendant Amos, II, would not be able or willing to serve their term, as those reasons were all set out in the Dispute Notice, the SEC whistleblower complaint, the IRS whistleblower complaint, and the DOL whistleblower complaint placed before the Director Defendants by the Plaintiffs before the 2017 Proxy was issued.

98.     Accordingly, the 2017 Proxy's statement that "*the Board of Directors has no reason to believe that any of the nominees will be unable or unwilling to serve*" was knowingly false.

99.     The 2017 Proxy also sought to assure shareholders – who were, unlike the Defendants, unaware of the alleged fraud – that they are in good hands with the current Board, including Defendants Amoses: "Our Board of Directors oversees an enterprise-wide approach to risk management, designed to achieve organizational and strategic objectives, to improve long-

term performance, and to enhance shareholder value. Risk management requires more than just understanding the risks we face and the steps management takes to manage those risks. The Board also must understand what level of risk is appropriate for the Company. ***Our Directors are equipped to make all of these determinations because they are integral to the process of setting the Company's business strategy.***"

100.    Contrary to these assurances, the Board was in fact asleep at the switch while Aflac was careening inexorably towards a disaster that claimed its first victim, Defendant Amos, II, shortly after the Defendants made these false reassuring statements.

101.    Defendant Johnson, as well as Defendants Bowers and Knapp as members of the Audit and Risk Committee, also published the Audit and Risk Committee Report included in the 2017 Proxy, in which they recommended to the Board to approve the Company's financial statements to be included in the Company's FY2016 Form 10-K for filing with the SEC. These Director Defendants at the time had actual knowledge of the fraud alleged by the Plaintiffs; they also knew that the Company had failed to investigate those allegations properly, but nevertheless recommended the approval of the Company's financial statements which were based at least in part on the pervasive fraud alleged by the Plaintiffs, and therefore false and misleading.

102.    In the letter to his fellow shareholders dated March 17, 2017 included in the 2017 Proxy, Defendant Amos encouraged the shareholders to "review the enclosed proxy materials and Aflac Incorporated's 2016 Year in Review and Annual Report on Form 10-K to learn more about the company and our latest achievements" -- but failed to say anything about the alleged fraud, which likewise goes unmentioned in the 2017 Proxy, the 2016 Year in Review or the FY2016 Annual Report on Form 10-K.

### b.  **Aflac's FY2016 Annual Report is false and misleading.**

103.    Aflac's FY2016 Annual Report published on February 24, 2017 and signed by every Defendant, likewise failed to inform the market about the fraud allegations, the Company's and Defendants' whitewash investigations thereof, or the Company's steps taken to cover up rather than remedy the identified deficiencies.

104.    Moreover, Defendant Amos as the Company's CEO signed the required Sarbanes-Oxley certificate accompanying the FY2016 Annual Report, certifying that the Company's financial statements "fairly represent in all material respects the financial conditions, results of operations and cash flows of the registrant."

105.    Defendant Amos further certified in the FY2016 Annual Report that he had disclosed to the Company's auditors and audit committee "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," and "*any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*"

106.    For all the reasons stated above, these certifications were false and fraudulent.

### E.    **Defendant Amos, II, resigns shortly after the re-election and engages in blatant insider trading.**

107.    Based on the false and misleading 2017 Proxy and FY2016 Annual Report, Defendants Amoses and the Director Defendants were all re-elected to Aflac's Board on the Annual Shareholders Meeting held on May 1, 2017 – Defendant Amos, II, only to resign from the Board the very next month.

108.    Thus, on June 8, 2017, Aflac issued a press release stating that Defendant Amos, II, had resigned from his position as President of Aflac and from its Board of Directors effective July 1, 2017 "to join a private equity firm." The press release also quotes Defendant Amos, II's

explanation of sorts for his sudden departure: "I have been fortunate to be involved with this company my entire life.  I've enjoyed it and have decided it's time for me to look forward to the next phase."

109.    According to Defendant Amos, II's interview published the same day by Columbus Ledger-Esquire in an article titled *Aflac President Paul Amos, Son of CEO Dan Amos, Leaving the Company*, the parting was "bittersweet":

> Amos, who turns 42 in July, has worked in some form or fashion at the supplemental insurance company since his teens, with his first job that of answering telephones in the firm's Investor Relations office. He joined the executive ranks in 2005, becoming executive vice president of U.S. operations, followed by a promotion to president and chief operating officer of Aflac U.S. in 2007. It was in 2013 that he was elevated to president of Aflac Inc., which included oversight of the firm's critical Aflac Japan operation.

> "It's tough leaving the business my grandfather built and my father runs, and I will forever bleed Aflac blue," Amos said. . . .

> Paul Amos, who expressed happiness that his move to JBA Capital will keep him and his family in Columbus [GA], still calls his preparation to leave the company bittersweet. On one hand, he is looking forward to working again with small businesses that have an entrepreneurial spirit. . . . On the other hand, he acknowledged, there will be some emotion walking out the door.

> "While my family, my grandmother and my father, they're all supportive, it's still a bit of a sad day. It's hard to leave Aflac," he said.

110.    On June 14, 2017, Defendant Amos, II, filed Form 4 with the SEC, disclosing that on June 12, 2017, he sold 222,889 of Aflac shares – or 44% of his total direct shareholding in the Company -- for over $17 million.

111.    Defendant Amos, II, sold his Aflac shares while in possession of material non-public Company information – *i.e.*, the credible, documented allegations of the massive fraud at Aflac (including but not limited to the AWP scheme in which he was personally involved) set out in the Dispute Notice and the SEC, IRS and DOL whistleblower submissions, and the

pending investigations thereof – information that has not yet been disclosed to the market participants but was known to Defendant Amos, II, in his capacity as Aflac's corporate officer and director, as one of the actual recipients of the Dispute Notice, and as one of the targets of those allegations and the ensuing investigations.

**F.     Aflac conducts substantial contemporaneous stock repurchases.**

112.    At the very same time when Defendant Amos, II, engaged in his insider selling, Aflac was operating a share repurchase program, pursuant to which during the second quarter of 2017 -- including June 2017, when Defendant Amos, II, sold his shares for $17 million -- Aflac "repurchased $200 million, or 2.7 million of its common shares. For the first half of the year, the company purchased $800 million, or 11.2 million of its common shares. Aflac purchased its shares on June 13, 2017, the next day after Defendant Amos II's sale. At the end of June, the company had 15.6 million shares available for purchase under its share repurchase authorizations." Aflac's Form 10-Q for Q2 FY2017.

113.    Furthermore, on August 8, 2017, Aflac issued a press release disclosing that "Aflac Incorporated's board of directors has authorized the purchase of up to 40 million shares of its common stock. This authorization is in addition to the 15.6 million shares that remained under a previous authorization as of June 30, 2017, bringing the total number of shares available for purchase to approximately 55.6 million."

114.    Aflac's stock repurchase program and Aflac's actual stock repurchases during the period of Defendant Amos, II's insider sales, in particular Aflac's repurchase on June 13, 2017, makes Aflac a contemporaneous purchaser for purposes of Section 20A of the Exchange Act.

115.    Moreover, Aflac's stock repurchase program had the purpose and/or effect of artificially boosting Aflac's earnings per share – because the repurchases lowered the total

number of shares outstanding – leading to higher stock price and increasing the value of Aflac's options granted to Defendants, including Defendant Amos, II, who received an option award of $280,000 in 2016, and Defendant Johnson, who received an option award of $261,185 in 2016.

### G.   The Defendants reject Plaintiffs' demands to take action.

116.   As shown above, Plaintiffs had repeatedly demanded that Aflac's directors and officers conduct a proper investigation of the serious fraud allegations raised in their Dispute Notice, and offered their full cooperation in any such investigation, but have been consistently rebuffed in their attempts, both by the Company's management Defendants Amoses and by its non-management Director Defendants.

117.   *First*, Plaintiffs' detailed Dispute Notice alleging numerous ongoing violations at the Company was sent to its most senior executive directors Defendants Amoses on December 10, 2016.

118.   Less than a month later, with the intervening holiday season, Aflac responded by unequivocally denying Plaintiffs' allegations as "wholly without merit." As turned out later, Aflac did not even have in its possession key documents underlying the Dispute Notice allegations, and did not even bother to ask the Plaintiffs for those documents before denying their allegations, without any basis and in bad faith.

119.   *Second*, in their March 8, 2017 submission to the independent directors of Aflac, Plaintiffs stated that it was "simply inconceivable that the management had properly investigated our detailed allegations, given the scope and breadth of the alleged wrongdoings, and determined in good faith that they were all without any merit."

120.   Plaintiffs then demanded that the independent directors take the necessary actions: "it is incumbent upon the independent directors of AFLAC, and consistent with their fiduciary

duties, to conduct a proper internal investigation of our allegations without any interference by the executive directors or management, in particular Messrs. Daniel Amos, Paul Amos II, and other AFLAC executives expressly alleged in the Dispute Notice to have been personally aware of and/or participated in the fraud." Plaintiffs again offered "to cooperate with and assist the independent directors in their investigation."

121.    In response, Defendant Johnson admitted that "the Board had previously been advised of the allegations raised in your December letter and on the company's due diligence efforts" – but relegated the Plaintiffs to the Company's outside counsel Alston & Bird, which was retained to represent the Company itself and its executives alleged to have committed fraud (who had already denied Plaintiffs' allegations without conducting a proper investigation), as well as the Director Defendants.

122.    *Third*, by letter dated March 28, 2017, Plaintiffs once again requested the Board to "investigate our allegations in good faith, and take all the necessary corrective actions."

123.    The response to that demand came from Alston & Bird in the form of a hollow and frivolous threat made against Plaintiffs' counsel, but with no substantive response to Plaintiffs' demand to investigate their allegations. Moreover, Ms. Cassily of Alston & Bird admitted that the firm also represented the Director Defendants, in addition to representing the Company and its executives alleged to have committed fraud.

124.    *Finally*, on June 23, 2017, Plaintiffs, through counsel, made a formal demand upon Aflac to take a suitable action against Defendant Amos, II, pursuant to Section 14-2-831 of the Georgia Code. Joffe Decl., ECF No. 1-1 Ex. G.

125.    In particular, the letter stated that Defendant Amos, II, "ha[d] violated his fiduciary duties to the Company and its shareholders, as well as committed securities fraud. A

lawsuit by the Company against him would be able to seek disgorgement of his improperly obtained profits and other damages. Accordingly, our clients demand that the Company bring a suitable action against Mr. Amos II to redress these violations and seek appropriate remedies."

126.   On September 12, 2017, Plaintiffs' counsel received an email from Jones Day, stating that "we represent the special committee of the Board of Aflac Incorporated that is charged with investigating the allegations set forth in your June 23, 2017 letter to Lisa Cassilly regarding Paul Amos. In connection with that investigation, we would like to schedule a time to speak to you about your letter."

127.   On September 15, 2017, Jones Day attorneys and Plaintiffs' counsel discussed Plaintiffs' June 23, 2017 demand letter on a conference call; in the course of that telephonic discussion, Jones Day attorneys revealed that Aflac did not have a copy of the 2010 emails between Defendant Amos, II, and Plaintiff Conroy regarding the AWP metric, which emails were quoted in the Dispute Notice, and asked Plaintiffs' counsel for a copy thereof, which Plaintiffs' counsel provided later that day. This fact is reflected in the SLC Report on p.13.

128.   The fact that as late as in September 2017, Aflac did not have in its possession one of the key email exchanges directly implicating Defendant Amos, II, in the AWP fraud – the exchange first cited in the December 2016 Dispute Notice and expressly referred to in subsequent correspondence with the Director Defendants -- necessarily meant that whatever investigation Aflac had undertaken that led it to unequivocally deny Plaintiffs' allegations in January 2017 was not conducted properly or in good faith but was nothing but a whitewash protecting the accused executives, Defendants Amoses.

129.   Likewise, "the company's due diligence efforts" referred to by Defendant Johnston in his March 20, 2017 letter, were demonstrably inadequate for the same reasons.

130.    On September 21, 2017, Plaintiffs' counsel received a letter from Alston & Bird (Joffe Decl., ECF No. 1-1 Ex. H), stating:

> A Special Litigation Committee was formed on July 12, 2017, by a majority vote of the independent Directors at a special meeting of the Company's Board of Directors. The Special Litigation Committee, which consists of three independent Directors, has the full and exclusive authority to consider and determine whether the prosecution of the demanded action is in the best interests of the Company and its shareholders. The Special Litigation Committee has made a determination in good faith after conducting a reasonable investigation upon which its conclusions are based that the maintenance of the demanded action is not in the best interests of the Company.

131.    The Special Litigation Committee that decided that "the maintenance of the demanded action [against Defendant Amos II] is not in the best interests of the Company" was composed of three independent directors of Aflac, Director Defendants Bowers, Moskowitz and Stith, who had previously denied Plaintiffs' demands to investigate Defendant Amos, II's alleged fraud without interference of the Company's executive management and caused Aflac to issue misleading 2017 Proxy and FY2016 Annual Report.

132.    In sum, prior to filing this Complaint, Plaintiffs have attempted to obtain the desired action from the Company and its Board in good faith for the period of over ten months, as particularized above, but have been repeatedly thwarted in their efforts by the Defendants, culminating in the formal rejection of Plaintiffs' demand.

133.    This action followed with the filing of the original complaint on December 14, 2017.

## H.    The 2018 Releases are false and misleading.

134.    After the news of the lawsuits caused Aflac stock to drop precipitously on January 12, 2018, Defendants actively sought to discredit and minimize Plaintiffs' allegations by

labelling all of them "false" and "without merit" in the 2018 Releases, among them the SLC
Report publicly released after four months of captivity.

135.    The SLC Report did *not* in fact address many of Plaintiffs' alleged violations;
*admitted* the ones it addressed; and admitted Defendant Amos II's *knowledge* of those violations
at the time of his stock sale.

136.    The SLC Report admits the following:

- the "AWP" metric manipulation (SLC Report at p. 45);

- the SBA fraud (SLC Report at p. 60);

- keeping the sales calendar open past year-end, resulting in "the nine day
  extension affect[ing] the sales data in 2015" (SLC Report at p. 61, explained as
  not affecting "the Company's numbers used for revenue reporting" – what
  numbers those would be, and how the Company comes up with them, the SLC
  does not ask);

- that Defendant Amos II had knowledge of those allegations at the time of his
  trade (SLC Report at p. 33, explained as "limited knowledge" because of his
  unfamiliarity with the U.S. operations – despite his serving as the President of the
  Company and its Director at the time);

- that Aflac purchased shares on July 13, 2017 (SLC Report at p. 63), the next day
  after Defendant Amos II's sale, making it a contemporaneous purchaser for
  purposes of Section 20A.

137.    The SLC Report claims that those admitted violations were immaterial, which
claim of immateriality evaporated on January 12, 2018 with the stock price plunge, and which
claim was entirely bogus to begin with for the following reasons: (a) the allegations were most
material to the integrity, honesty and ethics of the Company's top corporate executives, not
necessarily a particular GAAP line item; and (b) having touted the AWP and "new annualized
premiums" to shareholders and analysts as "key operational metrics" indicative of the
Company's financial position and growth prospects, Defendants should not be heard now to say

that they are immaterial because of their non-GAAP nature. Indeed, the 7% one-day stock drop pronounced the materiality of Plaintiffs' allegations loud and clear on January 12, 2018.

138.    The SLC Report is even more remarkable for what it omits than for what it admits, and it altogether omits Plaintiffs' allegations of:

- "Fraudulent underwriting," aka "overselling" -- *i.e.*, selling additional policies to policyholders without their knowledge or consent by forging their signatures; improper bundling of stand-alone policies; fraudulent enrollment of unqualified applicants; etc.;

- "Individual-to-Group Conversion," *i.e.*, sales that are conversion of existing coverage, cannibalizing own pre-existing business for the sake of reporting new premiums and maintaining the illusion of growth;

- Sexual harassment; and

- Whistleblower retaliation.

139.    Notably, the 2012 RSA required Aflac to correct such market conduct violations as "sales of duplicate policies," "overselling," and "sales that are conversion of existing coverage," and to pay a stiff fine for committing them. These are the same violations that Plaintiffs' Dispute Notice alleges and Defendants' SLC Report *conceals*. Accordingly, Aflac's 2018 Releases that Plaintiffs' allegations were all "false" and "without merit" are themselves demonstrably baseless and misleading.

140.    The SLC Report also mentions in passing -- but nowhere refutes or even addresses -- numerous other violations alleged by Plaintiffs in their SEC and IRS whistleblower submissions that have been known to Defendant Amos II at the time of his stock sale, such as employee misclassification, violation of Section 125 of the IRS Code, an undisclosed slush fund, and the institutionalized theft of commissions through the abuse of the so-called "sit codes."

141.    Finally, the SLC took a fundamentally flawed approach to its investigation of Defendant Amos II's insider sales by focusing on his *involvement* in the fraud alleged in the

Dispute Notice rather than his *knowledge* of it. "When asked to identify the information [Plaintiffs] possess concerning Paul Amos's involvement in the allegations set forth in the December 2016 and March 2017 letters, Mr. Joffe responded that Mr. Amos's personal involvement is irrelevant to the insider trading claim. Rather, he stated that what is at issue is that he knew of the allegations when he sold his shares." SLC Report at p. 13. Yet, as the SLC Report itself makes clear, the investigation's focus was largely on Defendant Amos II's involvement in one particular aspect of the fraud (AWP) rather than his knowledge of the totality of Plaintiffs' grave allegations not limited to the AWP scheme, and backed up by copious (and growing every day) evidence. Indeed, in their Demand Letter, Plaintiffs stated that "Mr. Amos II sold his shares while in possession of material, non-public Company information – *i.e.*, our allegations of massive fraud at Aflac (including but not limited to the AWP scheme) and the pending investigations thereof that have not yet been disclosed to the market participants." Joffe Decl., ECF No. 1-1 Ex. G.

142.    To put it all together: three documents of indisputable authenticity -- Aflac's 2012 RSA, Plaintiffs' 2016 Dispute Notice, and Defendants' 2017 SLC Report -- read side-by-side, without more (and there is more), blow away Defendants' cover-up, demonstrate Aflac's continuous market misconduct, and make Plaintiffs' case that neither the Company nor the Board properly investigated their allegations known to them for over a year while dismissing them as false.

## CAUSES OF ACTION

### COUNT I
### Violation of Section 10b of the Exchange Act and SEC Rule 10b-5
### (against all Defendants)

143.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

144.    Rule 10b-5, promulgated by the SEC under Section 10(b) of the Exchange Act,
prohibits fraudulent conduct in connection with the purchase or sale of securities. See 15 U.S.C.
§ 78j.

145.    Rule 10b-5 provides that it is unlawful for any person, directly or indirectly: "(1)
to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of
material fact or to omit to state a material fact necessary in order to make the statements made, in
the light of the circumstances under which they were made, not misleading, or (3) to engage in
any act, practice, or course of business which operates or would operate as a fraud or deceit upon
any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

146.    During the relevant period, in connection with Aflac's repurchases of Aflac
shares, Defendants disseminated or approved false or misleading statements about Aflac as
alleged above, which they knew to be false or misleading and were intended to deceive,
manipulate, or defraud.

147.    Defendants also omitted to disclose material facts about the pervasive fraud
alleged at the Company necessary to make the statements made not misleading.

148.    The underlying fraud by Defendants Amoses inflated the price of Aflac's stock,
and the Director Defendants' failure to disclose or properly investigate the alleged fraud helped
to maintain those artificially inflated prices throughout the relevant period and until January 12,
2018.

149.    At the same time that the price of the Company's common stock was inflated due
to the underlying fraud and the Defendants' failure to disclose or investigate it, Defendants
caused Aflac to repurchase millions of its own shares at the artificially inflated prices.

150.    Defendants, individually and/or in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuing course of conduct that operated as fraud and deceit upon the Company; made various false or misleading statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements and omissions intentionally, knowingly, or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Aflac stock, which were intended to, and did, (a) deceive Aflac regarding the alleged fraud, (b) artificially inflate and maintain the inflated price of Aflac stock, and (c) cause Aflac to repurchase its shares at artificially inflated prices.

151.    Throughout the relevant period, Defendants were in possession of material adverse non-public Company information. Defendants were among the senior executive management and lead non-management directors of the Company, and were therefore directly responsible for all materially false statements and omissions made during the relevant period as alleged herein.

152.    As described above, Defendants acted with scienter as they each had direct knowledge of the alleged fraud and acted in intentional or reckless disregard of that knowledge. The misstatements and omissions set out in this complaint were all known to the Defendants during the relevant period, but the Defendants failed to disclose the relevant material information in order to make their public statements non-misleading.

153.    Defendants made their false and misleading statements in connection with the Company's repurchases of its stock as alleged herein. In repurchasing shares in connection with the stock repurchase program, Aflac relied on Defendants' false and misleading statements and

omissions under the "fraud on the market" doctrine. The "fraud on the market" presumption of reliance applies to Defendants' misstatements and/or omissions of material fact because the market for Aflac shares was efficient during the relevant period and promptly digested current information about the Company from all publicly available sources and reflected that information in the price of Aflac stock. Aflac relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to Defendants' misstatements and omissions as alleged herein.

154.    As a result of Defendants' misconduct, Aflac has suffered and continues to suffer damages in that it has paid and continues to pay artificially inflated prices for Aflac common stock pursuant to its stock repurchase program. Aflac would not have purchased these shares at the prices it paid, or at all, but for the undisclosed fraud and the artificial inflation of the stock price caused and maintained by Defendants' false and misleading statements and omissions.

155.    As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its repurchase of common stock at inflated prices. Accordingly, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

**COUNT II**
**Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**(Against All Defendants)**

156.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

157.    SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the

time and in light of the circumstances under which it is made, is false or
misleading with respect to any material fact, or which omits to state any
material fact necessary in order to make the statements herein not false or
misleading or necessary to correct any statement in any earlier
communication with respect to the solicitation of proxy for the same
meeting or subject matter which has become false or misleading.

158.    Defendants issued or caused to be issued materially false and misleading

statements and omitted or caused to be omitted material facts in the 2017 Proxy, which urged

shareholders to re-elect the members of the Board, including Defendants Amoses, and to approve

their compensation, *inter alia*.

159.    The 2017 Proxy was false and misleading because it contained false and

misleading statements made by Defendants as set out above and omitted to disclose material

facts necessary to make those statements non-misleading.

160.    By reason of the conduct alleged in the complaint, the Defendants violated

Section 14(a) of the Exchange Act and SEC Rule 14a-9.

161.    As a direct and proximate result of Defendants' violations, Aflac misled or

deceived its shareholders into re-electing the members of the Board and approving their

compensation, *inter alia*. The misleading information contained in the 2017 Proxy was material

to the Aflac shareholders' decision to re-elect the Board members and approve their

compensation because it was material to the integrity of the directors nominated for re-election.

162.    Indeed, the 2017 Proxy stated that the "impeccable record and reputation for

honest and ethical conduct" was among the threshold requirement for the nominees, implying

that each nominee including Defendants Amoses had satisfied that requirement.

163.    Defendants -- including Defendant Amos, II, -- also stated in the 2017 Proxy that

the "Board of Directors has no reason to believe that any of the nominees will be unable or

unwilling to serve" on the Board, while failing to disclose those very reasons, which were known

to Defendants from the Plaintiffs' allegations, and which, upon information and belief,

eventually did lead to Defendant Amos, II's resignation.

164.    Plaintiffs, on behalf of Aflac, seek relief for damages inflicted upon the Company

based on the misleading 2017 Proxy in connection with improper re-election of the members of

the Board and/or approval of their compensation.

### COUNT III
### Violation of Section 20A of the Exchange Act
### (Against Defendant Amos, II)

165.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set

forth herein.

166.    Defendant Amos, II, by virtue of his position as President of Aflac and a member

of its Board of Directors, as a recipient of Plaintiffs' submissions blowing the whistle on the

pervasive fraud at Aflac, and as one of the alleged wrongdoers named in those submissions, had

access to material information about the Company not available to the public.

167.    Defendant Amos, II, knowingly traded on that material non-public information

when he sold 222,889 of Aflac shares – or 44% of his total direct shareholding in the Company -

- for over $17 million on June 12, 2017.

168.    Defendant Amos, II, sold his shares with the actual knowledge that their value

was inflated as a result of the underlying fraud and Defendants', including his own, failure to

disclose that fraud to the shareholders.

169.    According to Aflac's publicly disclosed share repurchase program, "for the first

half of the year [2017], the company purchased $800 million, or 11.2 million of its common

shares." Moreover, during the second quarter of 2017 – which includes the June 2017 period

when Defendant Amos, II, sold his shares -- Aflac "repurchased $200 million, or 2.7 million of

its common shares." In particular, Aflac repurchased its shares on June 13, 2017, the next day after Defendant Amos II's sale.

170.     Accordingly, Aflac was a contemporaneous purchaser of Aflac shares within the meaning of Section 20A of the Exchange Act at the time when Defendant Amos, II, sold his shares.

171.     As a contemporaneous purchaser, Aflac was damaged by the actions of Defendant Amos, II, in that in reliance on the integrity of the market, Aflac paid artificially inflated prices for its stock, and would not have purchased that stock at the prices it paid, or at all, had it been aware that the market prices had been artificially inflated. At the time of the purchase of the stock by Aflac, the fair and true market value of that stock was substantially less than the price paid by the Company.

172.     Defendant Amos, II, is therefore liable to the Company for damages caused by his violation of Section 20A of the Exchange Act.

## COUNT IV
### Breach of fiduciary duties
### (Against All Defendants)

173.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

174.     Each of the Defendants owed fiduciary duties to Aflac and its shareholders, *i.e.*, the highest obligations of good faith, fair dealing, candor, loyalty and due care in the administration and management of the Company affairs, including the duty reasonably to investigate and prevent and/or remedy violations of law occurring at the Company.

175.     Each of the Defendants knowingly, consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty and reasonable inquiry to Aflac and its shareholders.

176.    Defendants Amoses as executive directors of Aflac were fully aware of the fraud at the Company alleged by the Plaintiffs by virtue of their executive positions at the Company; their knowledge of and/or participation in and/or failure to prevent such instances of fraud as the SBA scheme, the AWP scheme, and the Individual-to-Group Conversion among other violations that had been reported to them by the Plaintiffs, both contemporaneously and in the Dispute Notice; and their actual receipt and knowledge of Plaintiffs' Dispute Notice and their SEC, IRS and DOL whistleblower submissions.

177.    Instead of properly investigating those allegations and taking appropriate corrective actions, Defendants Amoses allowed the Company to retaliate against Plaintiffs Conroy and Varela, ignored Plaintiff McCarthy's complaints, and participated in and/or orchestrated the Company's current efforts to whitewash the fraud alleged by the Plaintiffs, all in breach of their fiduciary duties to the Company.

178.    Director Defendants were also aware of the fraudulent practices at the Company committed by its senior executives as alleged by Plaintiffs, because they were specifically put on notice of those violations by Plaintiffs, who provided copies of their Dispute Notice and their SEC, IRS and DOL submissions to the Defendants in hopes that these independent directors would take suitable actions to investigate and redress them.

179.    In response to Plaintiffs' demand on the Director Defendants to conduct a proper investigation of their allegations without interference from the Company's executives, Defendant Johnson admitted that "the Board had previously been advised of the allegations raised in your December letter and on the company's due diligence efforts."

180.    Director Defendants knew or ought to have known that Plaintiffs' fraud allegations raised in the Dispute Notice involving Defendants Amoses were credible, as

demonstrated by the Company's implicit confirmation of the AWP fraud and the recruitment fraud following those allegations.

181.    Director Defendants knew or were reckless in not knowing that Plaintiffs' fraud allegations raised in the Dispute Notice involving Defendant Amos were also credible, as demonstrated by the Company's own contemporaneous confirmation of the SBA fraud.

182.    Director Defendants also knew or were reckless in not knowing that the "company's due diligence efforts" in investigating Plaintiffs' allegations were a whitewash, because the Company had "unequivocally" denied Plaintiffs' allegations as "wholly without merit" without even reviewing the documentary evidence underlying those allegations. As stated by the outside counsel to the SLC in September 2017, Aflac did not have in its possession the key 2010 emails between Plaintiff Conroy and Defendant Amos, II, confirming the latter's participation in the AWP fraud at that time. It necessarily follows that Aflac denied the allegations without even bothering to examine the evidence offered by the Plaintiffs, confirming that the investigation was not done in good faith but designed to protect the Company executives, including Defendants Amoses.

183.    Accordingly, Defendants Amoses breached their fiduciary duties to the Company and its shareholders by participating and/or condoning the alleged fraud at the Company and by whitewashing the Company's subsequent investigations thereof.

184.    Director Defendants breached their fiduciary duties to the Company and its shareholders by participating in the whitewash designed to protect the accused executives and by refusing to take any corrective and/or remedial action. Instead of conducting an independent investigation of Plaintiffs' allegations, Director Defendants relegated the investigation to the Company itself and the Company's outside counsel Alston & Bird tainted by conflicts.

185.   All Defendants have failed to implement a system of internal controls at the Company sufficient to detect and prevent the fraud such as that alleged by Plaintiffs.

186.   Defendants' respective breaches of their fiduciary duties caused damages to the Company and its shareholders, for which all Defendants are jointly and severally liable in the amount to be proven at trial.

### COUNT V
### Unjust enrichment
### (Against Defendant Amos, II)

187.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

188.   Defendant Amos, II, received the benefit of over $17 million by selling Aflac shares in violations of securities laws and in breach of his fiduciary duties to the Company and its shareholders.

189.   Defendant Amos, II, retained that benefit and unjustly enriched himself thereby at the direct expense of the Company and its shareholders.

190.   Defendant Amos, II, should not be permitted unjustly to enrich himself at the expense of the Company and its shareholders, and should be required to make restitution of the benefits received and retained.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment against Defendants, including the following:

A.   Determining that this action is a proper derivative action maintainable under the law by Plaintiffs on behalf on the nominal defendant Aflac;

B.   Declaring that Defendants have breached their fiduciary duties to Aflac and violated federal and state laws as alleged herein;

C.  Determining and awarding to Aflac the damages sustained by it as a result of the violations set forth in this Complaint from each Defendant, jointly and severally, together with pre- and post-judgment interest thereon;

D.  Awarding to Aflac restitution and ordering disgorgement of all profits and benefits obtained by Defendant Amos, II, as a result of his insider trading;

E.  Awarding the Plaintiffs costs and disbursements related to this action, including reasonable attorneys' fees, costs and expenses; and

F.  Granting such other and further relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  February 1, 2018

Dimitry Joffe
DJ-6498
Joffe Law P.C.
230 Park Avenue, 10th Fl.
New York, NY 10169
Tel: (212) 309-8711
Email: dimitry@joffe.law

*Counsel for the Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTIN CONROY, GERARD MCCARTHY, and LOUIS VARELA, derivatively on behalf of Aflac, Incorporated, <br><br> Plaintiffs, <br> v. <br><br> DANIEL P. AMOS, PAUL S. AMOS, II, DOUGLAS W. JOHNSON, CHARLES B. KNAPP, BARBARA K. RIMER, ELIZABETH HUDSON, W. PAUL BOWERS, JOSEPH L. MOSKOWITZ, MELVIN T. STITH, <br><br> Defendants, <br><br> -and- <br><br> AFLAC, INCORPORATED, <br><br> Nominal Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) **C.A. NO. 1:17-CV-09767-DLC** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## <u>CERTIFICATE OF SERVICE</u>

I, Dimitry Joffe, hereby certify that on this 2d day of February 2018, I caused a copy of the Corrected Verified Amended Stockholder Derivative Complaint, with exhibits, to be served electronically upon the registered participants in this case through the ECF system

_Dimitry Joffe_
Dimitry Joffé

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN CONROY, GERARD MCCARTHY, and LOUIS VARELA, derivatively on behalf of Aflac, Incorporated,<br><br>Plaintiffs,<br><br>v.<br><br>DANIEL P. AMOS, PAUL S. AMOS, II, DOUGLAS W. JOHNSON, CHARLES B. KNAPP, BARBARA K. RIMER, ELIZABETH HUDSON, W. PAUL BOWERS, JOSEPH L. MOSKOWITZ, MELVIN T. STITH,<br><br>Defendants,<br><br>-and-<br><br>AFLAC, INCORPORATED,<br><br>Nominal Defendant. | C.A. NO. 1:17-CV-09767 (DLC)<br><br>VERIFICATION |

I, Martin Conroy, being duly sworn, declare as follows:

I am a shareholder of Aflac Incorporated and has been throughout the relevant period of the foregoing Amended Verified Derivative Complaint. I have retained competent counsel and am ready, willing and able to pursue this action vigorously on behalf of the Company. I have reviewed the Amended Complaint and, based upon discussion with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Amended Complaint is true and correct to the best of my knowledge, information and belief.

I declare under the penalty of perjury that the foregoing is true and correct.

February 1, 2018

_____
Martin Conroy

NATALIE CORDERO
Notary Public - State of New York
NO. 01CO6344333
Qualified in New York County
My Commission Expires Jun 27, 2020

feb 2, 2018

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTIN CONROY, GERARD MCCARTHY, and LOUIS VARELA, derivatively on behalf of Aflac, Incorporated, <br><br> Plaintiffs, <br><br> v. <br><br> DANIEL P. AMOS, PAUL S. AMOS, II, DOUGLAS W. JOHNSON, CHARLES B. KNAPP, BARBARA K. RIMER, ELIZABETH HUDSON, W. PAUL BOWERS, JOSEPH L. MOSKOWITZ, MELVIN T. STITH, <br><br> Defendants, <br><br> -and- <br><br> AFLAC, INCORPORATED, <br><br> Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **C.A. NO. 1:17-CV-09767 (DLC)** <br><br> **VERIFICATION** |

I, Gerard McCarthy, being duly sworn, declare as follows:

I am a shareholder of Aflac Incorporated and has been throughout the relevant period of the foregoing Amended Verified Derivative Complaint. I have retained competent counsel and am ready, willing and able to pursue this action vigorously on behalf of the Company. I have reviewed the Amended Complaint and, based upon discussion with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Amended Complaint is true and correct to the best of my knowledge, information and belief.

I declare under the penalty of perjury that the foregoing is true and correct.

February 1, 2018

_____
Gerard McCarthy

Allyson Bowen
Notary Public
State of Florida
My Commission Expires 08/28/2018
Commission No. FF 155565

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| MARTIN CONROY, GERARD MCCARTHY, and LOUIS VARELA, derivatively on behalf of Aflac, Incorporated, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | **C.A. NO. 1:17-CV-09767 (DLC)** |
| DANIEL P. AMOS, PAUL S. AMOS, II, DOUGLAS W. JOHNSON, CHARLES B. KNAPP, BARBARA K. RIMER, ELIZABETH HUDSON, W. PAUL BOWERS, JOSEPH L. MOSKOWITZ, MELVIN T. STITH, | ) ) ) ) ) ) | **VERIFICATION** |
| Defendants, | ) ) ) | |
| -and- | ) ) | |
| AFLAC, INCORPORATED, | ) ) ) | |
| Nominal Defendant. | ) ) | |

I, Louis Varela, being duly sworn, declare as follows:

I am a shareholder of Aflac Incorporated and has been throughout the relevant period of the foregoing Amended Verified Derivative Complaint. I have retained competent counsel and am ready, willing and able to pursue this action vigorously on behalf of the Company. I have reviewed the Amended Complaint and, based upon discussion with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Amended Complaint is true and correct to the best of my knowledge, information and belief.

I declare under the penalty of perjury that the foregoing is true and correct.

February 1, 2018

_____
Louis Varela

**FLORIDA JURAT**
FS 117.05

State of Florida
County of Broward }

Sworn to (or affirmed) and subscribed before me this

2 day of FEBRUARY, 2018
Day      Month      Year

by LOUIS E VARELA
Name of Person Swearing or Affirming

_____
Signature of Notary Public — State of Florida

BETHSIE M DEJEAN
Name of Notary Typed, Printed or Stamped

BETHSIE M DEJEAN
Notary Public – State of Florida
Commission # FF 174951
My Comm. Expires Nov 6, 2018

Place Notary Seal Stamp Above

☐ Personally Known
☒ Produced Identification

Type of Identification Produced: CALIFORNIA
DRIVER LICENSE

─────────── **OPTIONAL** ───────────
*Completing this information can deter alteration of the document or*
*fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____   Number of Pages: _____

Signer(s) Other Than Named Above: _____

©2017 National Notary Association

M1304-10 (09/17)