IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

MARTIN CONROY, GERARD MCCARTHY,   *
and LOUIS VARELA, *derivatively*
*on behalf of Aflac, Inc.*,   *

    Plaintiffs,   *

vs.   *

DANIEL P. AMOS, PAUL S. AMOS   *      CASE NO. 4:18-CV-33 (CDL)
II, DOUGLAS W. JOHNSON, CHARLES
B. KNAPP, BARBARA K. RIMER,   *
ELIZABETH HUDSON, W. PAUL
BOWERS, JOSEPH L. MOSKOWITZ,   *
MELVIN T. STITH, and AFLAC,
INCORPORATED,   *

    Defendants.   *

_____

O R D E R

    Plaintiffs are shareholders of Defendant Aflac Incorporated

("AFLAC"). Concerned about several corporate transactions and

potential mismanagement, they urged AFLAC to bring claims against

certain officers and members of the board of directors for breach

of fiduciary duty, unjust enrichment, and violations of sections

10(b), 14(a), and 20A(a) of the Securities Exchange Act of 1934,

15 U.S.C. §§ 78j(b), 78n(a), 78t-1(a). After AFLAC notified

Plaintiffs that a committee of outside directors investigated the

claims and determined, with the advice of independent counsel,

that pursuing them was not in AFLAC's best interests, Plaintiffs

filed this derivative action on behalf of AFLAC against Defendants,

who are current and former officers and/or directors. Defendants respond that the outside directors were independent and made their determination in good faith after conducting a reasonable investigation. Accordingly, they move to dismiss this action pursuant to Georgia's derivative-action dismissal statute, O.C.G.A. § 14-2-744. Plaintiffs oppose dismissal, arguing that the outside directors were not independent, that they did not conduct a reasonable investigation, and that they did not act in good faith. For the reasons explained in the remainder of this Order, Defendants' motions to dismiss (ECF Nos. 42 & 43) are granted.

## FISH & FAMILY

Before addressing the merits of the pending motion to dismiss, the Court must respond to Plaintiffs' counsel's invitation for the undersigned to evaluate whether he should recuse himself from these proceedings. In a footnote in Plaintiffs' counsel's brief, he suggests that the undersigned should consider recusal because of certain familial relationships and the undersigned's affiliation with the so-called *Fish House Gang.* Pls.' Resp. to Defs.' Mot. to Dismiss 18 n.10, ECF No. 51. Preliminarily, the undersigned notes that because counsel did not file an affidavit pursuant to 28 U.S.C. § 144, the undersigned is not required to refer the recusal issue to another judge before proceeding further in this action. Nonetheless, the undersigned finds it necessary to clear

up any suggestion of bias. *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989) (explaining that a judge has an obligation under 28 U.S.C. § 455 to recuse, *sua sponte*, when proper grounds exist).

Plaintiffs' counsel suggests that the undersigned and certain Defendants are members of what he describes as a "tight-knit group of local elites" called the *Fish House Gang*, also known as the *Fish House Crowd* by those who have no motive to sensationalize the moniker. This group actually includes approximately two-hundred invitees who gather three or four times a year to enjoy fried fish, french fries, hushpuppies, coleslaw, and each other's company. The undersigned has been invited to these functions over the years and has attended with some regularity. The group conducts no official business, charges no membership fees, and has no stated organizational purpose. The attendees pay for the cost of their own meals. Although it is possible that one or more of the Defendants in this action may have attended one or more of these fried-fish suppers in the past, the undersigned has no specific recollection of them having done so and does not believe that they are presently on the invitee list.

The applicable recusal standards provide no basis for counsel's careless suggestion that attendance at these functions disqualifies the undersigned from presiding over these proceedings. Under 28 U.S.C. § 455(a), the test is "whether an

objective, disinterested, lay observer" knowing the grounds on which recusal is sought "would entertain a significant doubt about the judge's impartiality." *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988). Attendance at social events that a party to litigation may have also attended does not create the appearance of partiality or bias and is not a legitimate basis for recusal. *See Parrish v. Bd. of Comm'rs of Ala. State Bar*, 524 F.2d 98, 101, 104 (5th Cir. 1975) (finding judge's friendship with defendants, witnesses, and defense counsel did not "exceed what might be expected as background or associational activities" of "the usual district judge" and did not give reasonable grounds to question judge's impartiality);[1] Code of Conduct for United States Judges Canon 4 cmt. (Judicial Conference 2014) ("Complete separation of a judge from extrajudicial activities is neither possible nor wise; a judge should not become isolated from the society in which the judge lives."). Nor does it provide a basis for recusal under § 455(b)(1), which asks whether the undersigned *actually* has a personal bias or prejudice concerning a party. *United States v. Amedeo*, 487 F.3d 823, 828 (11th Cir. 2007).

Plaintiffs' counsel's recusal suggestions extend beyond the *Fish House Crowd.* He suggests that the undersigned should consider

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

recusal because certain members of the undersigned's extended family are allegedly related to the Amoses and that other members of the undersigned's extended family are allegedly AFLAC employees. A judge must recuse when "a person within the third degree of relationship" to the judge is or could be involved in a proceeding in certain ways or has "an interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(5). None of the individuals counsel identifies are within the third degree of relationship to the undersigned; at least one of the identified family members is dead; and to the best of the undersigned's knowledge, the others are not employed with AFLAC.

Neither fish nor family disqualifies the undersigned from presiding over this action. And because "there is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is," the undersigned has a solemn duty to remain. *Carter v. W. Publ'g Co.*, No. 99-11959-EE, 1999 WL 994997, at *2 (11th Cir. Nov. 1, 1999) (Tjoflat, J., addendum to pro forma order denying recusal motion) (alteration in original) (quoting *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987)).

## DISMISSAL UNDER O.C.G.A. § 14-2-744

A shareholder derivative action filed in the name of a corporation organized under the laws of Georgia may be dismissed

if a committee of two or more independent members of the corporation's board of directors conducts a reasonable investigation into the claims and makes a good faith determination that maintenance of the action is not in the corporation's best interests. O.C.G.A. § 14-2-744(a)-(b). The corporation has the burden of proving "the independence and good faith of the group making the determination and the reasonableness of the investigation." *Id.* § 14-2-744(a). The Court thus examines the record to determine whether Defendants carried that burden.

THE RECORD

The Court finds that the present record is substantial and adequate for the Court to make its determination as to whether AFLAC has carried its burden here. Plaintiffs' counsel seeks leave to conduct limited discovery into the independence and good faith of the independent directors and the reasonableness of their investigation. While the Court may permit limited discovery "to facilitate inquiries into independence, good faith, and the reasonableness of the investigation," *Thompson v. Sci. Atlanta, Inc.*, 621 S.E.2d 796, 799 (quoting *Kaplan v. Wyatt* (*Kaplan II*), 499 A.2d 1184, 1192 (Del. 1985)), such discovery at this stage of a derivative proceeding is "intended more as an aid to the Court than it is as a preparation tool for the parties," *Kaplan v. Wyatt* (*Kaplan I*), 484 A.2d 501, 510 (Del. Ch. 1984). And it may be authorized when necessary "to facilitate the inquiries of the trial

6

court." *Kaplan I*, 484 A.2d at 510. In this case, the Court does not find that discovery is necessary to aid it in its resolution of the pending motions to dismiss. The existing voluminous record sufficiently illuminates the issues to be decided, and additional discovery is not likely to make a material difference.

## I.   The Parties

AFLAC is a holding company that provides supplemental insurance products through its wholly owned subsidiary American Family Life Assurance Company of Columbus ("Aflac"). Am. Compl. ¶ 37, ECF No. 23. Plaintiffs are disgruntled former employees and current shareholders of AFLAC stock who wish to assert claims on behalf of and for the benefit of AFLAC. *Id.* ¶¶ 29-36. Defendant Amos is the son of one of the three founding brothers of AFLAC, the current CEO of AFLAC, and the chairman of AFLAC's board of directors; Defendant Amos II is Amos' son and was the president of Aflac and a member of AFLAC's board until June 8, 2017. *Id.* ¶¶ 43-44. Defendants Johnson, Knapp, Rimer, Hudson, Bowers, Moskowitz, and Stith are non-management members of AFLAC's board, or "outside directors."   Some of the outside directors are chairs and/or members of certain board committees. *Id.* ¶¶ 46, 49-50, 52-55.

## II.  Plaintiffs Notify AFLAC Senior Management & Outside Directors of Alleged Fraudulent Practices

In December 2016, Plaintiffs' counsel sent Amos, Amos II, and AFLAC's general counsel a dispute notice explaining that a group of former AFLAC sales associates, including Plaintiffs, believed

7

AFLAC employees were engaged in certain improper business practices. *Id.* ¶¶ 57-58; *see generally* Am. Compl. Ex. 3, Letter from D. Joffe to Amos *et al.* (Dec. 10, 2016), ECF No. 23-1 at 95–110 [hereinafter Dispute Notice].[2] The notice made the following specific accusations: (1) AFLAC engaged in fraudulent recruiting by promising potential sales associates they could make more money than was actually possible; (2) AFLAC manipulated its key operational metrics to artificially inflate its potential earnings and growth; (3) AFLAC engaged in fraudulent underwriting through various means designed to artificially inflate its earnings; (4) AFLAC engaged in fraudulent accounting practices by improperly extending revenue reporting periods; and (5) AFLAC regional sales coordinators and market coordinators stole sales associates' commissions (collectively, the "Fraud Allegations"). Dispute Notice ¶¶ 98-108. The associates also alleged that AFLAC retaliated against them for informing management of the Fraud Allegations. They asked AFLAC to waive their arbitration agreements and allow them to pursue related claims against AFLAC in court. *Id.* at 108-09.

In-house counsel for AFLAC informed Plaintiffs' counsel by letter that AFLAC would investigate the Fraud Allegations. 1st Decl. of D. Joffe [hereinafter 1st Joffe Decl.] Ex. B, Letter from

---

[2] For ease of reference, pin cites to pages of an exhibit within ECF Nos. 1-1, 23-1, and 49-1 refer to the pagination provided by CM/ECF.

C. Coppedge to D. Joffe (Dec. 14, 2016), ECF No. 1-1 at 21. Less than a month later, AFLAC informed him that that it unequivocally denied the Fraud Allegations and demanded that the associates individually submit their disputes to arbitration. 1st Joffe Decl. Ex. C, Letter from C. Coppedge to D. Joffe (Jan. 5, 2017), ECF No. 1-1 at 23-24.[3] Three months later, Plaintiffs' counsel sent a substantially similar notice to AFLAC's outside directors. *See, e.g.*, Am. Compl. Ex. 5, Letter from D. Joffe to M. Smith (Mar 8, 2017), ECF No. 23-1 at 121-23. Johnson, on behalf of the outside directors, informed him that they were already aware of the Fraud Allegations and had been informed of management's due diligence efforts. 1st Joffe Decl. Ex. E, Letter from D. Johnson to D. Joffe (Mar. 20, 2017), ECF No. 1-1 at 42. Johnson's letter also informed Plaintiffs' counsel that AFLAC had retained outside counsel from Alston & Bird to represent AFLAC in relation to the dispute notice and directed him to address future correspondence to the outside counsel. *Id.* Plaintiffs allege that Defendants breached their

---

[3] Ignoring their arbitration agreements, Plaintiffs' counsel sent AFLAC a draft complaint asserting several claims against AFLAC and its subsidiary on behalf of the sales associates, including two of the Plaintiffs in this action, and demanded that AFLAC settle the claims. AFLAC's subsidiary anticipatorily filed a petition in state court for an order compelling arbitration according to the arbitration agreements. The sales associates removed the case to this Court, and the Court found that the arbitration agreements were enforceable and, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, ordered the associates to submit their claims to arbitration. *See Am. Family Life Assurance Co. of Columbus v. Hubbard*, No. 4:17-CV-246 (CDL), 2018 WL 283254 (M.D. Ga. Jan. 3, 2018).

fiduciary duties to AFLAC by failing to adequately investigate the Fraud Allegations and by failing to implement controls to detect and prevent the alleged wrongful conduct.

**III. The FY2016 Annual Report, 2017 Proxy Solicitation, & Amos II's Resignation & Stock Sale**

Prior to Plaintiffs notifying the outside directors of their Fraud Allegations, AFLAC published its FY2016 Annual Report. *Am. Compl.* ¶ 78. In that report, AFLAC did not disclose the Fraud Allegations. *Id.* ¶ 103. In March 2017, AFLAC published its 2017 proxy solicitation to shareholders. *Id.* ¶ 93. The proxy solicitation assured shareholders that AFLAC was in good hands with the current board members and recommended that shareholders reelect Defendants to the board. The proxy likewise made no disclosure of the Fraud Allegations. *Id.* ¶¶ 93–94, 99, 100–102. On May 1, 2017, shareholders reelected Defendants to the board. *Id.* ¶ 107. Plaintiffs claim that the FY2016 Annual Report and 2017 proxy were false and misleading in violation of 15 U.S.C. §§ 78j and 78n and SEC Rules 10b-5 and 14a-9 because they failed to disclose Plaintiffs' Fraud Allegations and their potential effects on AFLAC's operations. *Id.* ¶¶ 144–55, 157–64.

In June 2017, Amos II notified AFLAC's board that he would be resigning as a director of AFLAC and as president of Aflac on July 1, 2017. *Id.* ¶¶ 96, 108. Amos II sold over 200,000 of his AFLAC shares a few days later. *Id.* ¶ 110. Plaintiffs claim that Amos II committed insider trading under 15 U.S.C. § 78t-1 because he

traded on material, nonpublic information—namely, knowledge of Plaintiffs' Fraud Allegations. *Id.* ¶ 111. Pursuant to its director-authorized stock repurchase program, AFLAC purchased some of its own shares the day after Amos II's stock sale. *Id.* ¶¶ 112, 114. Plaintiffs allege that AFLAC paid a higher price for its shares than it otherwise would have paid had it been aware the prices were inflated. *Id.* ¶ 171.

## IV. **Plaintiffs' First & Second Demands**

Shortly after Amos II's stock sale, Plaintiffs sent AFLAC's counsel their first formal demand ("First Demand"). *Id.* ¶ 124; 1st Joffe Decl. Ex. G, Letter from D. Joffe to L. Cassilly (June 23, 2017), ECF No. 1-1 at 47–48 [hereinafter First Demand]. The First Demand alleged that Amos II committed insider trading and breached his fiduciary duty to AFLAC when he sold his stock and demanded that AFLAC bring a lawsuit against Amos II for disgorgement and other damages. First Demand 47–48. In response, AFLAC's board created a special litigation committee composed of Bowers, Moskowitz, and Stith (the "SLC") to investigate the claims against Amos II and respond to Plaintiffs' First Demand. *See* AFLAC Board Resolution (July 12, 2017) at 1, ECF No. 42-3. The SLC eventually determined that pursuing the claims was not in AFLAC's best interest and rejected Plaintiffs' demand. 1st Joffe Decl. Ex. H, Letter from M. Gill to D. Joffe (Sept. 21, 2017), ECF No. 1-1 at 50; *see generally* 1st SLC Report, ECF No. 42-2.

Plaintiffs then circulated a draft complaint to AFLAC's outside counsel that named Amos, Amos II, Johnson, Knapp, Rimer, and Hudson as defendants ("Second Demand"). In the Second Demand, Plaintiffs asserted the breach of fiduciary duty claims and securities fraud and proxy fraud claims set forth above against all the named defendants, an unjust enrichment claim against Amos II arising out of his stock sale, and the insider trading claim against Amos II that the SLC had previously rejected. Compl. ¶¶ 105–16, 118–25, 135–47, 148–51, ECF No. 1.[4] Because the draft complaint presented the breach of fiduciary duty, unjust enrichment, and securities and proxy fraud claims to the SLC for the first time, the SLC considered the draft complaint to be a second formal demand and undertook to investigate. 2d SLC Report 2, ECF No. 42-5.

## V. The Present Litigation

While Plaintiffs were awaiting the SLC's response to their Second Demand, Plaintiffs instituted this action in the Southern District of New York. Compl. ¶¶ 100–103. Less than a month later, *The Intercept* published an online article detailing AFLAC's conduct alleged in Plaintiffs' original complaint, including the Fraud Allegations. Am. Compl. ¶ 1; Am. Compl. Ex. 1, David Dayen,

---

[4] The draft complaint is not in the record, but the initial complaint Plaintiffs filed in this action substantially tracked the draft complaint. 2d SLC Report 2, ECF No. 42-5. The Court thus relied on the original complaint to determine the contents of the draft complaint, which the SLC considered to be Plaintiffs' Second Demand.

"Behind the Duck: Former AFLAC Employees Allege Fraud and Abuse in Nearly Every Aspect of Company," *Intercept* (Jan. 11, 2018), ECF No. 23-1 at 2–14. The next day, AFLAC's stock dropped 7.5%. Am. Compl. ¶ 5. During the trading day, AFLAC published a press release denying the allegations in the article and informing the market that Plaintiffs' allegations were meritless. *Id.* ¶ 3. AFLAC then filed a Form 8-K with the SEC that reiterated AFLAC's position, and it published the report the SLC generated in its investigation of Plaintiffs' First Demand. *Id.* ¶ 7.

Plaintiffs subsequently amended their complaint to include additional claims of securities fraud for alleged false misstatements and omissions in the press release and the Form 8-K ("Third Demand"). *Id.* ¶¶ 4, 7–8, 10, 16–17, 20. The SLC considered the amended complaint to be a third formal demand and acted accordingly. 2d SLC Report 2 n.2. About a week later, the SLC issued its second report, rejecting Plaintiffs' Second Demand. *See generally* 2d SLC Report, ECF No. 42-5. The New York action was then transferred to this Court.

Defendants moved to dismiss Plaintiffs' Amended Complaint pursuant to O.C.G.A. § 14-2-744, which allows a corporate defendant to seek termination of a derivative suit based upon the recommendation of a committee of the corporation's independent board members. While those motions have been pending, the SLC issued its third report, also rejecting Plaintiffs' Third Demand.

*See generally* 3d SLC Report, ECF No. 59-4. The Court must decide whether Defendants have shown that the SLC's rejections of Plaintiffs' First, Second, and Third Demands warrant judicial deference such that Plaintiffs derivative action must be dismissed.

DISCUSSION

Under Georgia law, this action may be dismissed if the Court finds that the SLC members are independent, that they conducted a reasonable investigation, and that they acted in good faith. O.C.G.A. § 14-2-744(a)-(b). If Defendants prove the independence and good faith of the SLC and the reasonableness of its investigation, the Court must respect its determination that pursuing this action is not in AFLAC's best interests. *See Millsap v. Am. Family Corp.*, 430 S.E.2d 385, 388 (Ga. Ct. App. 1993) (explaining that the trial court's independent business judgment "is superfluous" under § 14-2-744).

I. **Independence of the SLC**

In assessing the independence of the SLC, the Court must determine whether its members are *both*

> "disinterested" in the sense of not having a personal
> interest in the transaction being challenged as opposed
> to a benefit which devolves upon the corporation or all
> shareholders generally, *and* "independent" in the sense
> of not being influenced in favor of the [alleged
> wrongdoers] by reason of personal or other
> relationships.

*Benfield v. Wells*, 749 S.E.2d 384, 387-88 (Ga. Ct. App. 2013) (emphasis added) (quoting O.C.G.A. § 14-2-744 revision commission's notes to 1988 passage). Section 14-2-744 also instructs courts that certain facts, standing alone, are insufficient to show a lack of independence. O.C.G.A. § 14-2-744(c) (stating that the "naming of the director in the derivative proceeding" or the fact that the director approved the challenged corporate action do not, standing alone, prove a lack of independence).

In response to Plaintiffs' First Demand, AFLAC's board created the SLC and appointed Bowers, Moskowitz, and Stith as members. They presided over the SLC's investigations of Plaintiffs' three demands. Defendants submitted declarations of Bowers, Moskowitz, and Stith in support of their motions to dismiss. 1st Decl. of W. Bowers, ECF No. 42-4 at 2-7 [hereinafter 1st Bowers Decl.], 1st Decl. of J. Moskowitz, ECF No. 42-4 at 8-13 [hereinafter 1st Moskowitz Decl.]; 1st Decl. of M. Stith, ECF No. 42-4 at 14-19 [hereinafter 1st Stith Decl.]. In those declarations, each member stated, "I do not have any personal interest or current or prior personal or business relationship that would affect my assessment and conclusions as a member of the [SLC]. I was not influenced in favor of [AFLAC] or any current or former director." 1st Bowers Decl. ¶ 10; 1st Moskowitz Decl. ¶ 10; 1st Stith Decl. ¶ 10. Similarly, the SLC reports detail the SLC

members' qualifications and backgrounds and explain the SLC's determination, on the advice of independent counsel, that there are no factors calling the SLC members' independence into question. 1st SLC Report 14–20; 2d SLC Report 20–24; 3d SLC Report 4–5. The Court finds that Defendants have preliminarily established that the SLC members were independent.

Plaintiffs contend that Bowers and Stith were not independent because of their personal and business relationships with Daniel Amos. Plaintiffs also contend that none of the SLC members were disinterested because each faced a substantial threat of personal liability for certain claims that Plaintiffs demanded should be asserted. The Court addresses these arguments in turn.

A. Outside Influences on SLC Members

As to SLC member Bowers, Plaintiffs point out that Bowers and Amos served together in leadership positions for other organizations: Bowers served as vice chairman while Amos served as chairman of the board of the Japan America Society of Georgia. 2d Decl. of W. Bowers ¶ 8, ECF No. 59-2 [hereinafter 2d Bowers Decl.]. Bowers served as president and CEO of Southern Power while Amos served as a director of its corporate parent, Southern Company; Bowers served as a senior vice president for Georgia Power while Amos served on its board of directors. *See id.* ¶ 9 (stating that Daniel Amos was a director of Georgia Power from 1997 to 2001); P. Bowers Bloomberg Bio., ECF No. 60-4 at 2 (stating that

Bowers was president and CEO of Southern Power Company from 2001 to 2005 and senior vice president retail marketing of Georgia Power from 1995 to 1998); D. Amos Bloomberg Bio., ECF No. 60-5 at 2 (stating that Amos served as a director of Southern Company from 2000 to 2006).

As to Stith, Plaintiffs point out that he and Amos simultaneously served as directors for Synovus Financial Corporation. *See* 2d Decl. of M. Stith ¶ 8, ECF No. 59-1 [hereinafter 2d Stith Decl.] (stating that he served with Daniel Amos on the Synovus Financial Corporation's board for a period of time). And as to Moskowitz, Plaintiffs point out that Moskowitz has known Amos since the early 1980s, when Amos spoke to Moskowitz about retaining Moskowitz's then-employer KPMG for a potential engagement. 2d Decl. of J. Moskowitz ¶ 8, ECF No. 59-3 [hereinafter 2d Moskowitz Decl.]. Bowers, Moskowitz, and Stith all stated in their declarations that their prior business relationships with Amos would not interfere with their abilities to consider Plaintiffs' demands on the merits. *Id.* ¶ 7; 2d Stith Decl. ¶ 7; 2d Bowers Decl. ¶ 7.

The Court finds that notwithstanding these prior professional relationships between the SLC members and Amos, the record establishes that the SLC members were sufficiently independent under Georgia law. The Georgia Court of Appeals has rejected attacks on independence based on similar, but far more suspect,

grounds than those in this case. *See Benfield v. Wells*, 749 S.E.2d 384, 388 (Ga. Ct. App. 2013) (finding director was independent even though alleged wrongdoer approved director's compensation at another corporation, director and alleged wrongdoer simultaneously served on a board committee of another corporation, and director and alleged wrongdoer were members of certain charitable organizations). Importantly, none of the SLC members have had these alleged relationships with Amos, outside AFLAC, since 2011.

In a similar context, the Delaware Supreme Court stated that the fact that some directors "move in the same business and social circles, or . . . are close friends, is not enough to negate independence." *Beam* ex rel. *Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051-52 (Del. 2004). Rather, such relationships must support the inference that the director "would be more willing to risk his or her reputation than risk the relationship with the [alleged wrongdoer]." *Id.* at 1052. Plaintiffs must show that the SLC members are "'beholden' to the [alleged wrongdoers] or so under their influence that their discretion would be sterilized." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993) (quoting *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).[5] The SLC members' prior business relationships with

_____

[5] These Delaware cases discussing director independence arose in the demand futility context under Delaware law and the independence inquiry

18

Amos do not overcome the evidence in the record establishing the SLC members' independence.  Defendants have carried their burden on this issue.

### B.  Disinterestedness of SLC Members

Plaintiffs additionally contend that the SLC members were not independent because they had a personal interest in the subject of Plaintiffs' demands.  *See Benfield*, 749 S.E.2d at 387 (explaining that "independent" under § 14-2-744 includes a lack of a personal interest in the action being challenged).  Plaintiffs argue that the SLC members were personally interested in rejecting their breach of fiduciary duty claims and their claims arising from alleged federal securities and proxy violations because they each would face personal liability if AFLAC pursued these claims.  The parties agree that "[d]irectorial interest . . . exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales*, 634 A.2d at 936.  However, the mere naming of a director as a defendant in a lawsuit does not render the director interested. O.C.G.A. § 14-2-744(c)(2).  Moreover, a board member's mere approval of a challenged corporate action does not strip that board member of independence, so long as the board member did not receive a personal benefit as a result.  *Id.* § 14-2-744(c)(3).  Otherwise,

in that context is analogous to the independence inquiry in the special litigation committee context under Georgia law.

board members would always be disqualified from serving on a litigation committee charged with the responsibility of evaluating whether a derivative action is in the best interest of the corporation. And that is simply not the law in Georgia. Only if the director faces "a 'substantial likelihood' of personal liability" if the corporation pursues the demand will the director be deemed incapable of independently considering the demand. *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) (quoting *Rales*, 634 A.2d at 936).

None of the Plaintiffs' claims allege that any member of the SLC acted in an individual capacity outside of the member's duties as a board member or that any member acted in a manner uniquely different than the other members of the board. Similarly, Plaintiffs do not allege that any SLC member benefitted in some unique way that was different than other members of the board or that any member received a unique personal benefit as a result of the challenged conduct. Plaintiffs allege that all members of the board violated duties owed to the corporation, and thus they share responsibility with the other members of the board. These types of allegations standing alone are not sufficient to taint the independence of the SLC.

But the Court does not rest its conclusions solely on this reason. The Court is also persuaded that the SLC and its independent counsel thoroughly analyzed the substance of the

claims asserted by Plaintiffs and rationally concluded that those claims do not subject the SLC members to a substantial likelihood of personal liability. Therefore, the SLC members were not conflicted from independently evaluating whether the maintenance of the derivative action is in the best interest of the company.

In support of this conclusion, the Court notes that Georgia law generally allows corporations to exculpate directors from liability to the corporation for acts or omissions taken as directors. O.C.G.A. § 14-2-202(b)(4). Pursuant to that provision, AFLAC's charter exculpates its directors from liability to AFLAC for their conduct as directors, except for acts or omissions committed in bad faith, appropriating corporate opportunities, intentional misconduct or knowing violations of the law, unlawful distributions, and conflicting interest transactions. Articles of Amendment, ECF No. 42-7. The SLC members cannot be deemed interested based on their potential personal liability for a claim that falls within the exculpatory provision of AFLAC's charter. *See, e.g.*, *Guttman*, 823 A.2d at 501-02 (explaining that a director can only face a substantial threat of personal liability for a certain claim if the corporate charter does not exculpate the director from liability for the claim). Therefore, only a substantial threat of liability arising out of a claim falling within the specific exceptions to AFLAC's exculpatory provision will render an SLC member interested. It appears that the claims

alleged by Plaintiffs would fall within the exculpatory clause of the AFLAC charter. But even if they did not, the Court finds that the theoretical possibility of the SLC members facing personal liability is not sufficiently substantial to render the SLC members interested and require their disqualification.

As noted previously, the SLC and its independent counsel investigated the claims to determine the SLC members' personal liability. Their report concluded that the fiduciary duty claims arising from a duty of care and good faith were meritless, and to the extent that any claim survived dismissal, the SLC members would be entitled to exculpation by AFLAC for any liability. Thus, the claims did not render the SLC members interested. 2d SLC Report 23, 95-96 (duty of loyalty), 99, 100-102 (good faith exercise of oversight duties).

The SLC and its counsel also investigated Plaintiffs' federal securities and proxy violation claims and determined that the Fraud Allegations were unsubstantiated and, thus, AFLAC had no duty to disclose them in the FY2016 Annual Report or 2017 proxy. *Id.* at 71, 87. The Court finds that the SLC's findings and analysis support these conclusions.

Because the SLC members did not face a substantial threat of personal liability if AFLAC pursued the claims asserted by Plaintiffs in the derivative action, the SLC members were disinterested in the subject of the demands.

**II. The Reasonableness & Good Faith of the SLC's Investigations**[6]

Whether the SLC's investigations were reasonable requires an examination of the thoroughness of its investigation in relation to the claims in the demands. *See, e.g.*, *Millsap*, 430 S.E.2d at 388 (finding investigation was reasonable where board examined all the allegations in the complaint and submitted a detailed report that supported its conclusion); *see also Thompson*, 621 S.E.2d at 797, 799 (finding trial court properly dismissed derivative suit under § 14-2-744 where board interviewed numerous witnesses, reviewed voluminous documents, and consulted with independent legal counsel and financial advisors); *Kaplan II*, 499 A.2d at 1191 (cited in *Millsap*, 430 S.E.2d at 388) (finding board's investigation was sufficient where board committee inquired into the central allegations in the plaintiff's demand).

Here, the SLC reports detail the extensive investigations the SLC and its outside counsel from Jones Day undertook in response to Plaintiffs' three demands. AFLAC provided the SLC and its counsel with access to over 600,000 documents and emails from various sources, and the SLC interviewed 24 witnesses, including the alleged director and officer wrongdoers. 2d SLC Report 24–33. AFLAC and its outside counsel fully cooperated with the investigations. 2d SLC Report 33. The SLC and its independent

---

[6] Plaintiffs contend that the SLC did not act in good faith for essentially the same reasons it contends the SLC's investigations were not reasonable. The Court thus addresses these issues together.

counsel analyzed the resulting facts, determined whether certain allegations were unfounded, analyzed the viability of the claims and potential defenses, and considered the potential costs and benefits to AFLAC of pursuing the claims. 1st SLC Report 30-71; 2d SLC Report 34-106; 3d SLC Report 7-23. Based on the Court's review of the SLC reports, and contrary to Plaintiffs' contention, the SLC investigated each of Plaintiffs' allegations, even those that were only tangential to Plaintiffs' derivative claims. The Georgia Court of Appeals affirmed the dismissal of a derivative suit where the SLC's report detailed a similarly thorough investigation, finding that the investigation was reasonable. *See Thompson*, 621 S.E.2d at 798-99. The Court finds that Defendants have established that the SLC's investigations of Plaintiffs' three demands were reasonable and conducted in good faith.

The Court does find it appropriate to specifically address three issues raised by Plaintiffs regarding the investigation—the alleged conflict of interest under which the SLC's counsel operated, the SLC members' alleged suspicious late disclosure of prior professional associations with Amos, and the SLC's decision not to interview the disgruntled former employees who made the Fraud Allegations.

Plaintiffs rely heavily on *Stepak v. Addison*, 20 F.3d 398 (11th Cir. 1994) to support their contention that the SLC's counsel was conflicted. In *Stepak*, the plaintiff made a demand on Southern

Company's board to take action against certain inside directors and officers for racketeering activities and against the entire board for SEC disclosure violations. *Id.* at 400-01. The outside directors retained independent counsel to advise them in responding to the demand, but Southern Company's general counsel from Troutman Sanders investigated the demand, provided the board with volumes of responsive factual outlines and documents, and presented its findings to the outside directors, who voted to reject the demand. *Id.* at 401. Troutman Sanders, however, had previously represented the inside directors and officers in criminal proceedings arising out of the same racketeering activities alleged in the demand. *Id.* at 408-09. The Eleventh Circuit, applying Delaware law, determined that the outside directors did not conduct a reasonable investigation because they allowed a conflicted law firm to dominate their consideration of the demand. *Id.* at 410.[7]

Plaintiffs argue that the SLC's investigations were similarly unreasonable because Alston & Bird investigated Plaintiffs' dispute notice on behalf of AFLAC while simultaneously representing the Amoses and the board in relation to the dispute notice. But the circumstances here are distinguishable from those in *Stepak*. As the Eleventh Circuit explained, when a company

---

[7] Under Delaware law, a plaintiff can maintain a derivative action even if the board refused his demand if he alleges, with particularity, why the board's refusal was wrongful.

receives a demand to sue its own management or directors, the company's interests and the alleged wrongdoers' interests are not necessarily opposed.  But a potential conflict exists because, although the wrongdoers would clearly best be served by rejecting the demand, the board does not know how to best serve the company's interest until it has investigated the demand.  *Id.* at 405.  And if counsel for the alleged wrongdoers also conducts the company's investigation, the investigation may not be impartial and the board may never truly learn where the company's interest lies.  *Id.*  That risk is not present in this case.

The original dispute notice did not ask AFLAC to sue the Amoses, the board members, or any other agent or employee of AFLAC. Instead, it alleged that AFLAC retaliated against certain sales associates, including Plaintiffs, and asked AFLAC to waive their arbitration agreements so they could pursue claims *against AFLAC*. Therefore, it was apparent upon receipt of the dispute notice that the interests of all the parties that could reasonably be expected to be sued by the sales associates were aligned.  AFLAC obviously would have wanted to defend any such claims, and, to the extent the dispute notice implicated AFLAC employees or agents, AFLAC would have wanted to defend those individuals to avoid any claims for vicarious liability.  It was not until Plaintiffs formally demanded that AFLAC's board take action against Defendants that AFLAC's interests began to diverge from the interests of Alston &

Bird's other clients. When that occurred, AFLAC established the SLC to evaluate how to best serve AFLAC's interests in responding to the demand and gave it authority to retain independent counsel, which the SLC did. The SLC's independent counsel, not Alston & Bird, then actually investigated the derivative demands. There was thus no risk that Alston & Bird's allegiance to its individual clients would have tainted the SLC's investigation of Plaintiffs' demands.

One concern in *Stepak* was that Troutman Sanders both controlled the flow of information to the directors evaluating the demand and simultaneously owed a duty of confidentiality to the alleged wrongdoers. *Id.* at 407, 411. The SLC reports do note that Alston & Bird cooperated with the SLC by providing the SLC's independent counsel with electronic documents Alston & Bird compiled and that it filtered the documents using search terms created by Alston & Bird. 2d SLC Report 33-34. But Alston & Bird did not *control* the flow of information to the SLC.

For example, the board provided the SLC with "access to all information of [AFLAC] or its subsidiaries which the [SLC] believes would assist it in its work" and directed the "directors, officers, employees, public accountants, and advisors" to "assist the SLC and to provide it with any and all documents and other information that the SLC deems necessary[.]" AFLAC Board Resolution (July 12, 2017) at 2, ECF No. 42-3. Further, the SLC's independent counsel

reviewed and approved the list of search terms Alston & Bird used to filter the electronic documents, and Alston & Bird ran additional search terms as requested by the independent counsel. 2d SLC Report 33–34. AFLAC also provided the independent counsel with all of Amos II's available emails and an imaged copy of his computer so that the independent counsel could run search terms as it deemed appropriate. *Id.* at 34. When the SLC was unable to acquire certain emails it deemed important, it contacted Plaintiffs' counsel who then provided the emails. *Id.* at 36 n.19. Alston & Bird's cooperation with the SLC and its independent counsel does not render the SLC's investigation unreasonable.

Plaintiffs also attack the SLC's investigations because, according to Plaintiffs, the SLC members failed to interview certain witnesses and did not thoroughly investigate the SLC members' independence. Pls.' Supp. Resp. to Defs.' Mot. Dismiss at 2, ECF No. 60. Plaintiffs point to the fact that the SLC members did not disclose their prior professional relationships with Amos until they filed supplemental declarations in support of the pending motions to dismiss. Their first declarations stated that they had no social or professional relationships with the Amoses that would impair their impartiality. Plaintiffs in response to Defendants' motions to dismiss asserted that the SLC members had such relationships with the Amoses. The SLC members then submitted supplemental declarations explaining their prior

professional relationships with Amos, which consisted of Amos serving on boards of other organizations in which an SLC member also served as a director or officer. Notably, the first declarations were not false; they simply failed to mention that the SLC members had served with Amos in leadership capacities in other organizations. Importantly, these mutual associations preceded 2012, well before the SLC was appointed here. It is reasonable to conclude that the most likely explanation for the late disclosure is that the SLC members determined that their prior relationships with Amos had no effect on their ability to act independently in evaluating demands that post-dated those prior relationships. And the Court has previously found that those prior relationships do not taint the independence of the SLC members under applicable law.

Plaintiffs also contend that the SLC investigation was unreasonable because the SLC did not interview certain witnesses that Plaintiffs think they should have interviewed. Specifically, Plaintiffs complain that the SLC never interviewed any of the sales associates who sent the dispute notice and who allegedly had personal knowledge of the conduct underlying Plaintiffs' Fraud Allegations. But the SLC already possessed the dispute notice that laid out the factual basis for the sales associates' allegations. The SLC knew what they alleged. It was not unreasonable for the SLC to decline to interview them when it

is likely that they would have added no new material information for the investigation.

The SLC conducted a thorough, reasonable and good faith investigation with the assistance of non-conflicted, independent counsel. The belief of Plaintiffs' counsel that the SLC could have done more does not change that fact.

CONCLUSION

The SLC investigated all of Plaintiffs' claims and decided that pursuing those claims was not in AFLAC's best interest. Based upon a thorough review of the substantial record, the Court finds that the SLC was composed of independent members who conducted a reasonable investigation into Plaintiffs' claims and that the SLC acted in good faith when it determined that pursuing Plaintiffs' demands was not in the best interest of AFLAC. Accordingly, pursuant to O.C.G.A. § 14-2-744, this action is dismissed in its entirety.

IT IS SO ORDERED, this 31st day of August, 2018.

S/Clay D. Land
———————————————
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA